Biddle Boggs *v.* Merced Mining Co.

# BIDDLE BOGGS *v.* THE MERCED MINING CO.

A Court cannot properly, even upon consent of parties, pass upon questions not raised by the written allegations of the pleadings.

There is no obligation resting upon the claimant of land under a Mexican grant, or upon the United States Surveyor-General, to give notice of the official survey, directed by the final decree of confirmation, to any one, and it is of no consequence how secretly or how openly the survey is made.

A private survey of a Mexican grant, made by the claimant, and presented with his petition to the Board of Land Commissioners for confirmation of the grant, is not binding upon the government. And, although in the case of Fremont, the claim was confirmed by the decree of the Board to the land embraced within such private survey so presented, yet, as that decree was reversed by the District Court; and, as, when the case was remanded to the District Court, from the Supreme Court, it was accompanied with directions to take further proceedings in conformity with the opinion of the latter Court, which opinion directed that a survey be made under the authority of the United States; and in the form and divisions prescribed by law for surveys in California; and, as the District Court did, accordingly, in entering its final decree, order that the land be so surveyed; and, as a survey was, in accordance with this decree, made by the Surveyor-General, and the patent was issued to Fremont in accordance therewith—this is the only survey which has any standing in Court, and there is no ground for the charge of fraud because this survey differs from the private survey made by Fremont, and annexed to his petition for confirmation.

The grant to Alvarado passed a present and immediate interest to ten square leagues, to be afterwards surveyed and laid off within the exterior limits of the general tract by the government. Such survey could only be made under the former government by its officers, and could not be made by the grantee himself. The right of survey passed with all other public rights, to the government of the United States, upon the cession of the country, and is now to be exercised by its officers, and in conformity with its laws. By the legislation of Congress the subject of surveys is intrusted to the Executive Department of government, and is not left to the direction or control of the grantee. The action of that department in the location of confirmed grants, when the quantity granted is without specific boundaries, lying within a larger tract, is conclusive and binding upon him. It may be true that under the recent decision of the Supreme Court in the Fossat Case, the United States District Court possesses jurisdiction to control the location made upon its decree, whilst the proceedings for confirmation are pending before it, but, subject to this qualification, the action of the department in the case mentioned is a finality with the claimant.

In ejectment on a patent issued upon a final decree of confirmation of land claimed under a Mexican grant, defendant cannot set up fraud in the survey or the procurement of the patent, to defeat the action. If the defendant have vested rights, so as to avail him against the assertion of any claim of the government respecting the premises in controversy, it would only follow that the patent was inoperative to that extent—not that it was void. The rights of the defendant would, in that case, be effectually protected by the provisions of the 15th Section of the Act of March 3d, 1851, and the patent would be like a second deed to premises previously granted, and pass, as to the property, no interest.

Nor would the fraud alleged in the answer here, and supposed to consist in a variance between the private survey made by Fremont, and the official survey by the Surveyor-General, and concealment of this latter survey, avail defendant in avoiding or resisting the patent, even if presented in an original or cross bill.

It would also be a fatal objection to a bill in equity by defendant, to set aside the patent in this case for fraud in its procurement, that Fremont, the patentee, is not a party. He would be a necessary party to any proceeding to avoid or set aside his patent, on the ground that it was issued through fraud or misrepresentation. His rights cannot be determined or impaired in any side suit between third parties.

The proceeding by bill in equity, which an individual is allowed to take to set aside a patent or control its operation, is in the nature of a bill to quiet title—to determine an estate held adversely to him—to remove what would otherwise be a cloud upon his own title; or is in the nature of a bill to enforce a transfer of the interest from the patentee, on the ground that the latter has, by mistake or fraud, acquired a title in his own name, which he should in equity hold for the benefit of the complainant. The individual complainant must therefore possess a title superior to that of his adversary, and of course, to that of the government through whom his adversary claims, or he must possess equities which will control the title in his adversary's name.

A party will, in many instances, be concluded by his declarations or conduct, which have influenced the conduct of another to his injury. The party is said, in such cases, to be estopped from denying the truth of his admissions. But to the application of this principle, with respect to the title of property, it must appear: 1. That the party making the admission by his declarations or conduct, was apprised of the true state of his own title; 2. That he made the admission with the express intention to deceive, or with such careless and culpable negligence as to amount to constructive fraud; 3. That the other party was not only destitute of all knowledge of the true state of the title, but of the means of acquiring such knowledge; and, 4. That he relied directly upon such admission, and will be injured by allowing its truth to be disproved. There must be some degree of turpitude in the conduct of a party, before a Court of Equity will estop him from the assertion of his title—the effect of the estoppel being to forfeit his property and transfer its enjoyment to another.

The private survey of Fremont in 1849, and his presentation of the same to the Board of Land Commissioners, as embracing and identifying the tract he claimed, and subsequent public and repeated disclaimers by him, at the time the defendant took possession of the premises in controversy in 1851, and afterwards, up to July, 1855, of any title or claim to the property, and of any title or claim to any land within the exterior bounds of the grant to Alvarado, except that designated in his survey; and the fact that he knew of the occupation and improvements of the defendant from the time possession was taken, without forbidding the same or claiming the premises until July, 1855, do not estop him from claiming the premises under his patent—there being no proof that he made such declarations and disclaimers willfully, or that he intended to deceive or defraud defendant, or influence its conduct.

Fremont's claim, under the grant to Alvarado, was to no specific tract. It was only an interest to a specified quantity, to be afterwards surveyed and laid off by the officers of the government. He evidently thought otherwise, and hence made his survey in 1849, and claimed a specific tract. His title to the land in controversy did not become perfect until the approval of the official survey,

Biddle Boggs *v.* Merced Mining Co.

after the decision of the Supreme Court of the United States in his case. The representations and disclaimers made by him previous to this final survey and approval, were clearly made under a misapprehension of his rights. These representations and disclaimers, under the circumstances, and under the law governing the location of land under floating Mexican grants, were not more than expressions of opinion as to what ought to be its location, or of a desire where it should be located. The law was as well known to defendant as to Fremont. Both must be presumed to have known it, although both were equally mistaken in its rule. There was no actual fraud in the conduct of Fremont, and to estop him by his declarations and disclaimers, under the circumstances, would be inequitable and unjust.

Defendant has no title to the land in controversy; that vested absolutely in Fremont by the final decree and approved survey, evidenced as they are by the patent under the signature of the President of the United States. Defendant does not claim under the pre-emption laws, and if it did, the claim would be untenable, as mineral land is expressly exempted from pre-emption by the legislation of Congress.

Conceding the land in controversy to be public land, as claimed by defendant, and that Fremont so represented it, and thus induced defendant to enter, occupy, and improve, yet he was not prohibited from subsequently acquiring the title from the government. The pre-emption laws not extending to mineral lands, defendant was a mere tenant at sufferance; by mere occupation it could acquire no rights which could control the action of the government, as the superior proprietor; and if that proprietor saw proper to give the land to Fremont, or to any other person, the defendant could interpose no objection.

By the patent, the government is estopped from asserting title to the premises, and if Fremont is estopped from asserting title against defendant, then it would have, by merely occupying the land as public land, rights superior to both, and that, too, in the face of an express prohibition of the sale by the government of the mineral lands.

Any right defendant, as a mining corporation, may have, as against Fremont, to the possession and use of the land for the purpose of extracting the gold, must be based upon the ground that the mineral does not pass with the soil as an incident to it, but belongs either to the United States, or the State of California, and that defendant has an effectual license to enter upon the premises and extract the same.

The statement of the existence of a general license from the United States to work the mines which the public lands contain, is inaccurate as applied to the action, or rather, want of action, of the government. There is no license in the legal meaning of that term. A license to work the mines, implies a permission to extract and remove the mineral. Such license from an individual owner can be created only by writing, and from the General Government only by Act of Congress. But Congress has adopted no specific action on the subject, and has left that matter to be controlled by its previous general legislation respecting the public domain. The supposed license from the General Government, consists in its simple forbearance.

It is a very convenient rule, in determining controversies between parties on the public lands, where neither can have absolute rights, to presume a grant from the government, of mines, water privileges, and the like, to the first appropriator; but such a presumption can have no place for consideration against the superior proprietor.

19

Biddle Boggs *v.* Merced Mining Co.

If the forbearance of the government were entitled to any consideration, as a legal objection to the assertion of the title of the government, it could only be so in those cases where it has been accompanied with such knowledge, on its part, of the working of the mines and the removal of the mineral, as to have induced investigation and action, had this been intended or desired. Such knowledge must be affirmatively shown by those who assert a license from forbearance.

The United States—holding as they do, with reference to the public property in the minerals only the position of a private proprietor, with the exception of exemption from State taxation, having no municipal sovereignty or right of eminent domain within the limits of the State—cannot, in derogation·of the rights of the local sovereign, to govern the relations of the citizens of the State, and to prescribe the rules of property, and its mode of disposition, and its tenure—enter upon, or authorize an entry upon, private property, for the purpose of extracting minerals. The United States, like any other proprietor, can only exercise their rights to the mineral in private property, in subordination to such rules and regulations as the local sovereign may prescribe. Until such rules and regulations are established, the landed proprietor may successfully resist, in the Courts of the State, all attempts at invasion of his property, whether by the direct action of the United States, or by virtue of any pretended license under their authority.

The general course of legislation in this State, authorizes the inference of a license from her to the miner to enter upon lands and remove the gold, so far as she has any right—but this license is restricted to the public lands.

The Act of 1850, (Ch. 97,) respecting the mines, the Practice Act of 1851, (Sec. 621,) relative to proof in actions respecting mining claims, the Act of 1852, relative to possessory actions, commented on, and the conclusion reached, that, so far as .they touch the question of a license from the State to mine, they refer to public lands alone.

APPEAL from the Thirteenth District.

Ejectment for premises situate in Mariposa County. Plaintiff was the lessee of John C. Fremont, to whom a patent was issued by the United States, bearing date February 19th, 1856, embracing a tract, including the premises in controversy. The case was tried by the Court without a jury, by consent of parties. The Court found the facts to be as follows:

1. That J. C. Fremont, at the time of demising the premises sued for, to the plaintiff, as stated in complaint, was the owner, and seized in fee simple of the tract of land called "Las Mariposas," mentioned in the complaint by virtue of a patent from the United States, dated the 19th day of February, 1856, signed by the President of the United States, countersigned by the Recorder of the General Land Office, and sealed with the seal of said office, and granting to the said Fremont, his heirs and assigns forever, the said tract of land called "Las Mariposas,"

according to the plat and survey thereof made and approved by the United States Surveyor-General for California, on the 31st day of July, 1855, as stated in the complaint, and that the said Fremont entered on said tract of land called "Las Mariposas," claiming title thereto under said patent.

2. That the premises sued for in this action, are parcel of the said tract of land, so as aforesaid granted and patented by the United States to the said Fremont.

3. That on the 22d day of April, 1857, the said John C. Fremont (by Rufus A. Lockwood, his Attorney in fact in that behalf, duly authorized) being seized, as aforesaid, of the said tract called "Las Mariposas," executed and delivered to the plaintiff the deed set out in said complaint, and thereby bargained, leased, and demised, the premises sued for, to the plaintiff, for the term of seven years then next ensuing, as stated in the complaint; and that, by virtue of said deed, the plaintiff thereupon became, and still is, the owner of the premises sued for, with the appurtenances, and entitled to the possession and use thereof, for the said term of seven years.

4. That there are appurtenant to the premises sued for, affixed to the soil and freehold, and parcel thereof, a quartz mill, machinery, fixtures, and other buildings and works, known as the "Mount Ophir Reduction Works;" and that the same were, and are, included in the said lease and demise to the plaintiff, and that the plaintiff is in like manner owner of, and entitled to, the possession and the use of the same, for the said term of seven years.

5. That at the commencement of this action, to wit: on the 23d day of April, 1857, the defendant was, and ever since has been, and still is, in possession of the premises sued for with the appurtenances, and occupying and using the same, and claiming and holding the same, without the consent and against the will of the plaintiff, and adversely to the title of the plaintiff, and of his said lessor.

6. That the defendant has been running and working said mill and machinery a part of the time since the commencement of this suit, when there was sufficient water for the purpose, but the defendant is not now running or working the same, for want of sufficient water; that the creek on which said mill is

erected does not afford sufficient water, at all times, to run said mill; that said creek does not become entirely dry, but that the water does not now run in the same where said mill is, and will not probably run there during the dry season, which usually continues till late in November.

7. That the wear and tear of said mill and machinery from running and working the same, amounts to the sum of three hundred dollars per month while the same is run and worked, but in order to work the same to advantage, it is necessary to keep the same constantly in repair, and the defendant has done so since the commencement of this suit.

8. That the monthly value of the said premises amounts to the sum of seven hundred and fifty dollars.

9. That the defendant is guilty of the trespass and ejectment laid in the complaint; and that the plaintiff has thereby sustained damages at the rate of seven hundred and fifty dollars per month, from the commencement of this suit, hitherto making in all, the sum of sixteen hundred and ninety dollars.

10. That the defendant continues to exclude the plaintiff from the premises, and to detain the same from him; and that the defendant intends to continue to run and work the said mill and machinery against the will of the plaintiff; and assuming the admissibility of all the evidence produced by the defendant, the Court further finds:

11. That the survey and plat set forth in said patent to said Fremont, and mentioned in the defendant's answer, are within the limits described in the original grant to Alvarado, confirmed to said Fremont, as mentioned in said patent.

12. That the charge set up in the defendant's answer, of fraud, concealment, and collusion, in the survey and certificate on which said patent issues, is not proved.

13. That the charge in the defendant's answer, that in procuring the issuance of said patent, a fraud was practiced upon the government in misrepresenting the quality and character of the lands embraced in the survey and patent, is not proved.

14. That the lands embraced in the patent to Fremont are mineral lands, containing gold-bearing quartz and placer gold mines; that the lands are rough and hilly, but there are small ranches on various portions of the land. A portion of the hills

and valleys is also used for grazing cattle, and to some extent for raising and cultivating vegetables and grain, but the principal business of the settlers on said lands is mining.

15. That in May, 1851, the premises sued for were vacant and unoccupied; that the defendant then entered upon said premises under a quitclaim deed from one Moffat, but it is not shown that said Moffat had any title to the premises, but on the contrary, the premises were then the public domain of the United States, except so far as the same were subject to Fremont's unconfirmed right to locate the Alvarado grant within the limits therein prescribed; that the defendant commenced improving the premises for mining purposes, in 1851, and has ever since used and occupied the same for such purposes, pursuant to the mining regulations prevailing in the district, and has made improvements and expenditures in the manner and to the extent stated in the answer; and, that until the month of July, 1855, Fremont never claimed the premises sued for as being within the lines of his Alvarado grant, but stated that the lines of his grant did not approach within one or two miles of the premises, and caused a survey of his claim to be made in 1852, the lines of which did not include the premises; and which survey the said Fremont published and represented as including the tract of land claimed by him under said Alvarado grant, but at the time of making such representations and disclaimers, said grant had not been finally confirmed and located; and it is not shown that in making such representations and disclaimers, the said Fremont willfully made any misrepresentations, or intended to deceive, or defraud, the defendant, or others, nor that he intended thereby to influence the conduct of the defendant.

16. That Fremont knew of the occupation, claim, working, and improvements, of the defendant from the time the defendant took possession till the present, without claiming the premises sued for till July, 1855, and without forbidding the defendant from working or improving the same, though he knew the defendant claimed the property; and that the said Fremont made the representations and disclaimers stated in the fifteenth finding, but without any fraudulent intent, and before the final location of his claim, and when it was unknown where the lines thereof would be fixed.

17. That no facts amounting to fraud or to a legal or equitable estoppel are proved in this cause, either as against the plaintiff or as against his lessor, the said Fremont. And upon the said pleadings, stipulations, proofs, and facts, the Court decides and finds the following points and matters of law, to wit:

1. That it is not competent for the defendant to attack or impeach the patent mentioned in the complaint and answer.

2. That the plaintiff is not estopped from insisting on his legal title to the premises sued for.

3. That the defendant is not entitled to any legal or equitable relief against the plaintiff's title.

4. That the plaintiff is entitled to the judgment and decree of the Court against the defendant for the recovery of the possession of the premises sued for, as described in the complaint, with the appurtenances and for the sum of sixteen hundred and ninety dollars, damages and costs of suit, and it is ordered that judgment be entered accordingly.

It is, therefore, considered, adjudged, and decreed, by the Court, that the said plaintiff, Biddle Boggs, do have and recover of and from the said defendant, the Merced Mining Co. the possession of the said premises set forth in said complaint, and described as follows, to wit: Beginning at a point where a line drawn from the northeast corner of Township, No. 5, South Range, No. 17, east, and running south twenty-four and a half degrees west, one hundred and twenty-nine chains, will terminate (said point of beginning being on the south side of the road leading from Mariposa to Stockton, by way of Mt. Ophir,) and running thence south forty chains to a stake; thence west forty chains to a stake; thence north forty chains to a stake near said road; and thence east along the direction of the said road forty chains to the place of beginning, and containing one hundred and sixty acres, (being part and parcel of the tract known as "Las Mariposas,") together with all the tenements, hereditaments, works, mills, machinery, fixtures, buildings, and appurtenances whatsoever, thereunto belonging, and including the works known as the "Mount Ophir Reduction Works."

And it is further considered, adjudged, and decreed, by the Court, that the said plaintiff do have and recover of and from the said defendant, the sum of sixteen hundred and ninety dol-

lars, in damages by the Court found and assessed, together with his costs and charges in this behalf laid out and expended, taxed at the further sum of ——— dollars, and that the plaintiff have a writ of possession and execution against the defendant accordingly.

All other material facts of the case are stated in the opinion of the Court.

*S. W. Inge,* for Appellant.

Under the stipulations in this case the controversy became, in effect, a chancery case, subject to the principles of equity jurisprudence. This Court will, therefore, examine the facts, (5 Cal. 192,) and will correct the errors below in whatever shape they appear. (4 Cal. 123.)

1. It was competent for defendant to attack or impeach the patent mentioned in the complaint and answer. The plaintiff can claim for his lessor's patent, only that, in a Court of law, in a common law action, where all equitable defenses are excluded, it is conclusive. But those who hold against a patent may show, in a Court of Equity, that it is issued by mistake or fraud. (*Bagnell* v. *Broderick,* 13 Pet. 450; *Gaines* v. *Nicholson,* 9 How. 364.) Although, in a Court of Law, a patent is conclusive of the location, in a Court of Equity the survey may be examined, and, in case of mistake or fraud, the patent issued thereon may be set aside. (*West* v. *Cochran,* 17 How. 403; *Stanford* v. *Taylor,* 18 Id. 410.) The proof of fraudulent collusion between Fremont and the Deputy Surveyor who made the survey, and the proof of fraud in procuring the patent at Washington, are established, and Appellant stands in a better position to resist the patent than that of the adverse parties in the cases cited, because claiming and holding under the State of California, and by the express sanction of her laws, it is protected against the patent by the 15th Section of the Act of 3d March, 1851. (Vol. 10, Stat. at Large, 634.)

2. The plaintiff was estopped from insisting on his legal title to the premises sued for.

The Appellant took possession in May, 1851, when the premises were vacant and unoccupied, and the mines therein unappropriated. The claim of Fremont as assignee of the grant to Alvarado, was well known; but this was understood to be a

grant for grazing lands, located in the valley of the river Las Mariposas, between the Snow Mountains and the San Joaquin. Appellant took possession, expended eight hundred thousand dollars in valuable improvements. Fremont knew of this, did not claim the premises till July, 1855, or forbid Appellant from working the mines; always, prior to 1855, stated his lines did not come within one or two miles of the premises, and in 1852 caused a survey of his grant to be made, which did not include the premises, and published it to the world as a true survey and map of his grant. Further, the proof shows Appellant was encouraged by Fremont to make the improvements named. Fremont is, therefore, estopped. Whether he acted with fraudulent intent or not is immaterial. The effect of his acts and declarations was to influence Appellant's conduct. (*Doe ex dem. Eyre* v. *Lanby*, 2 Esp. 635; 4 Monroe, 52; 5 N. H. 452.) The doctrine of estoppel is founded on the principle that it is wrong and unjust to permit a party to revoke or deny declarations, whether true or false, or prompted by mistake or fraud, which have influenced the conduct of another, as in the case at bar. (B. N. P. 142; Co. Lit. 332; Sugden on Vendors, Ch. 22, Sec. 30; 4 Wend. 483 *et seq.;* Cow. & Hill's Notes, Part 1, 369, 374, Note 225; 14 Johns. 446; *Dewey* v. *Bardwell*, 9 Wend. 65; *Welland Canal Co.* v. *Hathaway*, 8 Id. 480; 19 Id. 557; 5 Cal. 85.)

3. Defendant was entitled to full and complete relief against plaintiff's pretended title, independent of the two preceding propositions, and within the decision of the Supreme Court of the United States in Fremont's case.

Fremont had no title to any specific portion of land; his grant was a *float;* he had a vested interest in the quantity only, and an official survey was necessary to attach the grant to any specific ten leagues, and this did not occur till July, 1855. The lands in controversy being mineral lands, and as such exempt from pre-emption, and being unappropriated, were, in 1851, when defendant took possession, open to the lawful occupation of any one who desired to work the mines. By first occupation and appropriation, therefore, Appellant acquired a right, perfect against all the world, except the sovereign to whom the mines belong, to wit: the State of California. (*Hicks* v. *Bell*, 3 Cal. 227; *Stokes* v. *Barrett*, 5 Id. 39; *Irwin* v. *Phillips*, Id. 146; *Mer-*

*ced Mining Co.* v. *Fremont,* 7 Id. 317.)   And the State, at the first session of her Legislature, before Appellant commenced improvements on the premises, "gave whatever right the State might have in the mineral of the soil, and the right to mine, to all native born and naturalized citizens of the United States, who may wish to toil." (5 Cal. 97.)   Subsequent legislation is to the same effect.   The real controversy here is as to the gold, not the land.   The State may authorize, (what would otherwise be a trespass,) persons to go upon the lands of a private individual to search for and procure the gold, which is the property of the State. (5 Cal. 37.)   Fremont may own the soil, but the ownership of the gold is a separate thing.   The rights acquired by defendant by working the mine are vested and protected by State legislation.   The mining interest is favored beyond the agricultural interest. (*Irwin* v. *Phillips,* 5 Cal. 146; *Conger* v. *Weaver,* 6 Id. 548, and cases above cited.)

4. Appellant is entitled to a decree declaring the pretended lease void, and that it be delivered up and canceled, and that the action of ejectment be perpetually enjoined. (3 How. 463; 1 Baldw. 205, 232; 1 Story's Eq. 82, 491—493; 1 Henn. & Mun. 18; 1 Monroe, 65; *Bacon* v. *Conn,* 1 Sm. & M. Ch. 348; 11 Ala. 310; Pr. Act, Ch. 3, Sec. 254.)

*Joseph G. Baldwin* and *S. Heydenfeldt,* for Respondent.

1. What is the effect of the patent to Fremont?

It passes all the interest of the government to the land described, with the appurtenances, with appropriate words of grant in fee; and if it be conceded that the United States owned the minerals, which are but part of the earth, there can be no serious question that, under the term "land," they would pass to the grantee. (2 Blac. Com. 18; 1 Cruise on Real Prop. 58; 2 Bouvier, L. D. 4, Tit. Land.)

It matters not if, under the Spanish and Mexican system, the ownership of the minerals was held in distinct property from the ownership of the soil, and if grants of land did not carry a title to the minerals.   This distinction, if it exist, originated from the peculiar mining systems and jurisprudence of Spain and Mexico; which, of course, do not obtain in our country. If the United States owned the mineral with the land, they

had a right to keep it or part with it, and the government has chosen to part with it, as is evidenced by the patent, which only follows the law. (Act 3d March, 1851.)

The Mexican system of denouncement, by which a person was permitted, under certain forms, to enter on the land of another, and use his property in extracting ores from it, is entirely inconsistent with our system of government. To hold, that one man has a right to bring a troop of men to dig up another's farm, to hunt for gold or silver, would be as odious a doctrine as an assize of bread. It would be such an interference with rights of property and domestic commerce, as could not be maintained. Hence, our government invests the grantee of its lands with all the claim of the government. It is not material whether an immediate title to this land vested in Fremont by the grant, the survey, or the patent. If the grant vested it, then defendant was a trespasser; if the survey vested it, then the company was a trespasser from that time; if the patent vested it, then the company was a trespasser from the date of the patent. But, assuming that a title to this particular tract did not vest until the patent, still Fremont had an incohate right before, which became definite and located by the patent. Any implied license defendant may have from State legislation, to work the mines of gold upon public lands, must be subject to a change of ownership, and the cessation of the right to mine, must necessarily follow the purchase of the land by a citizen. Otherwise, the right of invasion of private property without consideration, would be established without any such specific legislation as was held to be requisite in *Tartar* v. *Spring Creek Water Co.* 5 Cal. 375; *Stokes* v. *Barret,* Id. 36, and other subsequent cases. The license ceases whenever the land ceases to be public.

But this land was not public land. The fact, that the grant was of a certain quantity within larger boundaries, did not lessen the right, nor make the title less operative, as a grant of a present interest. (*Fremont* v. *United States,* 17 How.; *Rutherford* v. *Green's Heirs,* 2 Wheat. 196.) Under these decisions, the land was private land ever since the grant, though this case does not require this much.

2. Out of caution, we take the position, that in land granted by the Mexican Government in California, before its acquisition

by the United States, the owner of the land is the owner of the precious metals, and this doctrine does not conflict with *Hicks* v. *Bell*, (3 Cal. 219.)

We concede, that in such grants the mines were subject to be denounced by the discoverer, according to the Mexican code. But they were not denounced in this case when the country was ceded to the United States, and the United States could not take the mines of precious metals in private lands, nor indeed in any lands, because that government had no local municipal sovereignty which could invest in it anything composing the *jura regalia*, either by the civil or the common law. It was the proprietor of the lands, but only held the eminent domain in trust for the future sovereign. (*Pollard's Lessee* v. *Hagan*, 3 How. 221, 223.) Now, when lands pass into private ownership, everything passes with them which is contained in them, unless there is an express reservation, either by deed or by operation of some rule of law, and when the law ceases, then the reservation must end, and everything must pass. So, if the common law rule, which secures mines of gold and silver to the sovereign, was abrogated, the right to such mines would be in the owner of the soil, without further provision—*cujus est solum, ejus est usque ad cælum*—and a maxim of the law of nations is, *quod nullius est, id ratione naturali occupanti conceditur*.

This doctrine was fully maintained by this Court in *People* v. *Folsom's Ex'rs*, (5 Cal. 373.) Upon the cession of the territory by Mexico to the United States, the sovereign right of Mexico to the mines ceased, and there was no sovereign to take. The Mexican law of denouncement was gone, for the mines could only be denounced by virtue of her proprietorship. The necessary result was, that as far as concerned mines in granted lands, they went with the land, and became the property of the owner, for the law does not tolerate the want of an owner for anything of value. The rule, in other words, working the reservation in every grant, is abrogated, and so the mines must pass to the owner of the fee.

If it be asked why the proprietorship of the United States of the lands, does not carry with it ownership of the mines—the answer is obvious—she takes merely as a Trustee holding for the future sovereign, as was decided in the case cited from 3 How. and

although she thus holds, her trust powers cannot keep in operation the Mexican law which reserves the mines in private lands —and she has no rule of her own by which she can maintain this exception from the general proprietary right. It is, therefore, from the loss of the rule making the reservation, that the owner of the land becomes vested with the right to the gold and silver, and being once invested, by virtue of existing laws, can not afterwards be divested.

If we concede the title of the mineral in the lands to be in the State, but the property in the soil to be in Fremont, it does not help Appellant. No law authorizes A to go on B's land and dig up soil, divert or use the water, and occupy the premises, in order to search for gold or anything else, merely because the gold belongs to C. Not even if C had given a general license to A to go and get the gold. True, the State Government might protect A against a trespasser in such a case. The owner of the land not objecting to the possession thus taken and held by A, it might give him priority over all subsequent possessors with no better right; but it could not give him any right against the holder of the title. Even if the Legislature had passed such a law, it would be flagrantly unconstitutional. It would be taking private property and appropriating it to the private uses of another, without even making compensation to the owner. Such a law would not bind the government of the United States, without its consent. The State cannot even tax public land, much less appropriate it to its own purposes, or that of its citizens, against the will of the proprietor. The State could not enter upon the land of the United States to dig up the soil for gold, even if it owned the gold. But the State has never claimed any such right. She has merely protected the entry upon and possession of public land, for the purpose of working the mines, against trespassers entering under no better title. She has merely regulated settlers' rights *inter sese.* Clearly, the General Government can take possession of its mining lands; can use them as it pleases—can build forts, custom-houses, trading stations, etc. or cultivate them. It could have taken possession of this tract—had it been owner—and the Merced Mining Co. would have been forced to abandon it. Fremont has the same right. A perfect right in the grantor, gives a perfect right in

the grantee.  If the occupier held by the mere forbearance, or even by the license of the government, the owner—does not the right to hold cease, whenever the government intervenes and revokes the license; and is not a transfer of the property a revocation ?  But there was no license—a mere toleration of this use and possession.

A license to enter on land, is not an interest.  (*Ex parte Coburn,* 1 Cow. 568.)  It is a mere authority, personal to the grantee, and revocable at the will of the grantor.  Nor can a right to enter upon and occupy lands for an indefinite period (for rail roads or anything else) be granted without a conveyance sufficient under the Statute of Frauds to carry a freehold.  (*Miller* v. *Auburn & Syracuse Railroad,* 6 Hill, 61; 4 East, 108.)  So an easement cannot be acquired by parol license, because that is revocable—but can pass only by deed.  (Id.)  Hence, Appellant never had any license, except one which was revocable.  Nor does it follow that the Appellant had any right to enter upon this land and extract the gold, even if we concede the State could have so done; because, before the State could authorize others to exercise this right, she must have established some system constitutional in itself and properly guarded in its provisions.  Appellant, justifying under the State, must, within the cases, show written authority from the State, or positive legislative enactment.  And even this would be unconstitutional, unless compensation be made for the land taken.

The company, then, having no rights against the General Government, the government could dispose of the land as it pleased.  Even if the patent can be attacked for fraud, it must be done directly—not collaterally.  (19 How.)  And if the government is willing to be defrauded, no one else can object.  This privilege of entering on public land is a mere gratuity, and the holder of the possession a mere tenant at will.  (8 Por. 326; 5 Stew. 82; 1 Id. 500; 7 Mo. 503.)

As to any policy of the United States Government in this matter, it changes no rule of law or vests any rights of property.  The whole legislation of Congress shows this.  In 1807, Congress passed a law forbidding, under severe penalties, intrusions on public lands, and this Act has never been repealed.  The preemption laws are acts of exemption and grace.  (1 Scam. 113.)

So with decisions in Mississippi, Indiana, and Alabama. Besides, the pre-emption laws exclude from their operation mineral lands, or lands claimed under grants. (Act Congress, 1853, p. 247.) No policy on this subject could be fixed except by Act of Congress. (*McConnell* v. *Wilcox*, 1 Scam. 344.)

As to estoppel. The defendant got all it contracted for—all Fremont was estopped from disputing. It claims that Fremont induced it to go upon this land, as public land—that going there, it acquired certain rights, to wit: a permit to stay as long as the government chose to allow; that is to say, it got a revocable license. This privilege it has enjoyed; the government has put an end to it. If Fremont had given the license, defendant could have claimed nothing more. How, then, can it be fraud in Fremont to take a title from the government, which was perfectly consistent with the rights and the title of the defendant, any more than if Fremont had induced the defendant to take a lease for a year, and then he had purchased the reversion? And if he had procured the reversion by fraud, how could defendant, who held his full term, complain, or defeat Fremont's title, by setting up for the landlord the fraud which he was willing should remain undisturbed?

Matters *in pais* relied on as estoppel, are not properly such at law or equity. They are regarded as frauds which equity will act on and compel the guilty party to convey his interest which he kept concealed when he ought to have discovered it. (Roberts on Frauds, 528; Adams' Equity 373, top; 150, side.) But this doctrine is only applicable to purchasers. The rule even, as to them, is limited to a purchase (permitted or encouraged by the holder of the title) of property from the vendor having no title, and of which defect of title he was at the time aware. The doctrine is further qualified in *Gray* v. *Bartlett*, (20 Pick. 193.) If the act be an encroachment on the soil or rights of another, an acknowledged tort, equally well known, or equally open to the knowledge of both parties, it gives no right. There can be no concealment or fraud where both parties have access to the facts, especially when the facts are of record—of general notoriety; and they are charged with knowledge of the law. (See, on this doctrine of estoppel, *Raw* v. *Pope*, 2 Ver. 239; 1 Dev. 452, 465.) To introduce this equity by way of estoppel, there

Biddle Boggs *v.* Merced Mining Co.

must be intentional deceit, or such gross negligence as amounts to the same thing. (Adams' Equity, 374; 1 Sto. Equity Jurisp. 391—393.) Mere representation that one has no title to land, does not prevent his acquiring the title afterwards. (4 Wend. 300; 6 Munroe, 50; Harr. 76; 2 Ala. 514; 7 Pick. 169; Id. 551; 9 Id. 520; 6 N. H. 521; 12 Wend. 105; 7 J. J. Marshall, 12; 3 A. K. M. 168; 1 Scam.)

As to setting aside a patent for fraud by a direct proceeding in equity, see *Seabury* v. *Field,* 19 How. 332, and cases cited; 6 Pet. 328; Id. 438; 15 Id. 93; 13 Id. 493; 13 How. 18; 9 Cranch, 87; 4 Wheat. 213; 11 Id. 380; 3 Pet. 340; 10 How. 348; 11 Id. 552; 5 Wheat. 293; 6 Cow. 281; 10 Johns. 23; 12 Id. 82; 5 Denio, 398.

No case can be found which upholds the right of any man to intervene to set aside a patent for fraud in its procurement, unless he is interested by right, recognized as such by law, in the subject of the controversy. A mere tenant at will or sufferance, claiming, not against, but only in subordination to, the title of the government—a mere gratuitous settler on the land of the government, cannot dispute his landlord's grant—reform his superior's proceeding—annul his superior's deeds.

As to impeachment of deeds by voluntary grantee, etc. see *Twynes' Case,* 3 Coke, 81; Roberts on Frauds, 369; 4 Cruise's Dig. 382, 383, 406; 1 Ch. Ca. 99; 3 Murph. 429.

But this patent cannot be attacked for fraud in this case, because the United States, being directly interested, must be a party. The government has given Fremont by deed binding on it ten leagues in full for his claim. And the consequence of setting aside this deed in favor of defendant, would be to give the land to defendant for nothing, and not only so, but to give the mineral land, which is not subject to sale. Fremont would come on the government, or lose the land by forfeiture. That is, one man loses a title without law, while another gains one without gift, grant, or inheritance. If it be said that the decision in this case does not affect the right of the United States, then this shows the conclusiveness of the argument; for it would result that Fremont's title might be divested because we had not located it in the right place, so far as regards the land and the defendant, and yet the United States could and would hold him to

that place. The United States could not claim it, because estopped by deed; Fremont could not claim it because bound by estoppel *in pais;* and the defendant would get it, because claiming through title, under or by the acts of Fremont, who himself got nothing. This legal paradox would have to be maintained, that a man having no claim has given another a title, and that other contesting a patent on the ground of fraud, gets by the mere fraud, the title under the patent, after he sets it aside. For it is clear that the United States would not be bound by the judgment between defendant and Fremont—consequently, Fremont would not be bound as against the United States; the patent would be still good as between them; but not good as against defendant; but defendant being in possession, and having better title than Fremont, and Fremont having better title than the United States, the defendant, of course, has a perfect title to all intents and purposes, in fee simple absolute. The defendant has thus turned by the doctrine of estoppel *in pais,* a mere trespass, at most a license, into a fee. In a contest between two claimants holding under the same title, one of which must get the land, the government is not a necessary party, for it is immaterial to her which gets it. But that is not this case.

Again, the claim of Fremont was in litigation; it was adjudicated between him and the United States. It was decided in his favor. The ministerial and executive act of putting him in possession alone remained. Executive discretion was the sole arbiter in this matter. No individual could contest. If any one, the legislative department alone could control it. (*Fremont's Case,* 18 How. 40.)

The patent or right to it can be contested in no other way than is provided by the Act of 1851. The patent is conclusive evidence of the then title of the government to the land conveyed.

As to estoppel on the ground of fraud. It is not favored in law, must be formally plead, and be certain to every intent. (Co. Lit. 352.) Here, there is no certainty, but everything is by argument. Again, an estoppel only binds for the interest sold or dealt with. (Co. Lit. 47 *b.*) There can be no estoppel against the law. (1 Term, 169; *Jones* v. *Lasser,* 1 Dev. & Bat. 457.) Here the estate was, at most, a tenancy at will, which had expired.

Defendant shows itself out of Court by answering, that Fremont had only a *float*—not a title to this particular spot. How could he fraudulently disclaim title to this spot, when he had no title, as defendant alleged?

It is not averred that defendant knew Fremont had title and fraudulently suppressed the fact, or fraudulently misrepresented the title, or made these statements as to not claiming the land in dispute, to the defendant, or in his hearing, or with a view to induce it to enter on, or to make improvements; nor is it averred that defendant entered in consequence of these statements. (See 3 Starkie's Ev. 28—36; 2 Starkie's N. P. 396; 2 M. & Payne, 293; 1 B. & P. 293; 2 Esp. N. P. C. 657; 1 Camp. 245; Cowp. 232; 6 Pick. 245; Greenl. Ev.; 14 Johns. 446.)

As to fraud in survey—Fremont was not bound to give defendant any notice of it.

*Baldwin,* in addition to the foregoing, filed an argument maintaining that the minerals in the public lands, so called, belong to the General Government as much as does the soil. His argument being mainly, that the doctrine of the common law in regard to the rights of the Crown are not applicable in the United States, for the reason that the original ownership of the minerals was in the Crown, and the Crown had never parted with that ownership; that here, the Crown of Spain had parted with the ownership of the mines to Mexico—to the Republic—to be held, not as a royal franchise, but merely as public property, subject to the laws and dominion applicable to other property; that the fact of the mines being a source of public revenue could make no difference, as this is true of all other property; that even conceding the property in the mines was strictly *jura regalia,* as held by Mexico, that it did not remain so in the hands of the United States Government, because Mexico sold her property in the minerals to the United States, who took as a proprietor; that it does not follow because a thing is held in a particular right, for a particular purpose, as incident to a particular object, to be used by the then possessor in a particular way, but with a full right of disposal, that the alienee takes it to be used, held, and applied, in the same way; that when Mexico parted with the minerals by treaty, as she undoubtedly did, the United States took them free from any claim of the State, afterwards

20

created, just as an individual would had Mexico granted all her mines to him; that gold and silver bear no such relation to sovereignty, State or national, that, perforce, the proprietor of the mines by purchase can hold them only as a sovereign, and that they cannot belong to any one but the local sovereign.

To say that, by the common law, the King owned the metals by virtue of his sovereignty, proves nothing, for the peculiar laws of England, touching the royal character and prerogative, give him this right, as it gave him his throne, his scepter, the right to declare war, and the right to administer justice, and to be irresponsible for his acts. But the common law, which establishes the right of royalty, has no effect in a Republic, where there is no King; the government here is what the laws have made it, and holds property only according to those laws, and those laws allow her to hold mines of gold and silver, as property, as well as gold and silver coin; and to take this source of revenue, whether a branch of the royal revenue before or not, as well as the customs, the public lands or anything else.

The legislation of Pennsylvania and New York do not imply a different doctrine; those States claiming the mines of gold and silver, because the King had never granted them.

*Cook & Fenner*, also, for Appellant.

1. That part of the brief of Respondent's counsel which is signed by both counsel, admits that the mines of precious metals within her limits belong to the State, in right of her sovereignty, and also that every citizen under our State legislation has a right to work the mines on the public lands, but insists that as soon as any portion of those lands becomes private property, the right of any citizen so to mine ceases. This we admit, so far as regards entries made subsequent to the land becoming private property, but deny it in cases where the entry for mining purposes was made while it belonged to the United States, as in this case. This State has, by specific laws, as well as by its general policy, permitted and invited her citizens to enter upon and work the mines upon public lands, and even to enter upon lands in which private property has already been acquired for agricultural purposes, for the purpose of mining. (*Hicks* v. *Bell*, 3 Cal. 227; *Stokes* v. *Barrett*, 5 Id. 39; *McClintock* v. *Bryden*, Id. 99, 100; *Irwin* v. *Phillips*, Id. 145—147.)

Biddle Boggs *v.* Merced Mining Co.

The defendant, then, entered by invitation of the State when her authority was supreme, and this license or permission has never been recalled, and its continuance, therefore, is lawful and right. The defendant did not enter under the Federal Government. No act of the Federal Government could or can make the original entry wrongful, or the continuance unlawful. All that Respondent's counsel say as to the authority under which defendant entered, being revocable at pleasure, is foreign to the case, because it has never been recalled. The patent from the United States cannot amount to a revocation of a permission given by the State. If this State had the power to make the original entry legal, it remains so, for there is nothing in the laws of the State, which requires any citizen, who has commenced mining on public lands, to retire as soon as they become private property; and defendant cannot be expelled from the land in dispute so long as there remains any gold in the soil, without establishing a doctrine which would strip the State of one of her highest attributes of sovereignty. It matters not whether the doctrine that mines of precious metals belonged to the sovereign in right of his sovereignty was originally founded on sufficient reasons, or not, for it has been part of the common law since the days of Edward the Confessor. (1 Plowden, 321, a.)

The argument that the mine in dispute passed to Fremont, because at the time of the cession, by Mexico, of her rights over California, there was no sovereign capable of taking sovereign rights in regard to the mine, California not being then in existence, may be answered thus:

1. The grant, under which Fremont claims, was made long before the cession, at a time when Mexico retained the *jura regalia* in regard to these mines, and it no more passed to Fremont than to any other citizen of the United States. 2. Previous to his patent, Fremont had no title to the land in dispute, and long before that time, California existed as a State, with full powers of sovereignty. 3. As soon as territory is acquired by the United States, an embryo State is begotten, and is as capable of taking legal rights as a *fœtus in ventre sa mere.*

2. Fremont is estopped by his acts and disclaimers, as set forth in the record.

He was not bound to take the land surveyed, for there was no

compulsion.   He procured the survey to be made in this partic-
ular locality.   And he ought not now to claim the improvements
and mineral, without at least putting the parties in the same
position they were before he disclaimed.   It is clear that no
granting power would have covered the land in question, with
all its improvements, by the patent, had it known the circum-
stances.   There must have been fraud.

Nor is the doctrine of estoppel confined to purchasers.   Both
Fremont and defendant knew his grant was not located, and he,
when applied to, took the responsibility of saying it will not be
located upon the particular property in dispute.   A party, who
takes unoccupied and vacant land, subject to a grant, occupies
the position of a purchaser, particularly when he is encouraged
by a party who knows he has a claim to land in the county,
yet to be located, and positively disclaims as to the particular
locality.

As to the proposition of Respondent, that Fremont could not,
by acts *in pais*, part with the title afterwards obtained, because
that would be to establish a parol gift of land, without consid-
eration, the answer is, that Fremont had no title to this particu-
lar piece of land.   Fremont merely disclaimed all claim to land
he did not own, but which, by chance, might be allotted to him.

Nor does the Statute of Frauds apply; that simply provides
that no interest in real estate shall pass, unless in writing, etc.;
but here there was no interest to pass, only a future possibility,
and he conveyed nothing.

*Lockwood & Wallace,* also, for Respondent.

No brief appears among the papers, though an elaborate one
was filed.

*Charles T. Botts,* also, for Respondent.

This case presents but two questions for the consideration of
the Court: 1. Did the right to the gold in the soil pass to Fre-
mont by his patent from the United States; and, 2. Has he done
anything whereby he is estopped from asserting that right
against the defendant?

Of these questions, I propose only to discuss the first.

That Fremont, the plaintiff's grantor, is the legal owner of the

*locus in quo,* is not denied ; but, it is asserted that, under our po-
litical system, the gold and silver in the earth belong to the sov-
ereign, even when the soil in which it is embedded may have
become individual property. It is asserted that, by the com-
mon law of England, the title to the royal metals vested in
the crown by right of sovereignty. To sustain this assertion,
we are referred to two authorities—one at the beginning, and
the other at the end, of reported cases : 1st of Plowden, and 3d
of California. There never was any such doctrine known to the
common law of England. The doctrine of that law was, *cujus
est solum, ejus est, ab imo usque ad cœlum.*

In *Hicks* v. *Bell,* two things, distinct and separate in their na-
ture, viz.: the sovereign right of eminent domain, and a personal
prerogative of the King of Great Britain, are confounded. There
are certain inherent rights, inseparable from the power of gov-
ernment that must necessarily attach to sovereignty wherever
it exists. Such is the power to take private property for public
use, known as the right of eminent domain. Of the same nature
is the right to control navigable streams, although the freehold
may be in a private individual. To the same class may possibly
belong the power to coin money. All these are powers abso-
lutely necessary to the very existence of civilized government,
and, consequently, they appertain to it wherever it exists. All
that has been effected by the most jealous guardians of private
rights has been to place a restriction upon the power of taking
private property for public use, by making compensation a pre-
requisite to the taking. Now, among these inherent sovereign
powers, we may reckon the power of taxation, or that power by
which revenue for the necessary expenses of the government is
created. The power to raise revenue is a general one, and at-
taches to all governments by virtue of sovereignty ; but the par-
ticular sources of revenue are fluctuating, and vary with the will
of each particular sovereign. The mines of gold and silver were
once one of the sources of revenue of the government of Great
Britain, and it would be as reasonable to claim tunnage and
poundage, and the sale of monopolies to be inherent, indefeasible
appurtenances of sovereignty, as to claim that the sovereignty of
California invested her with a right to the mines of gold and sil-
ver within her limits. Appurtenances of sovereignty are those

rights, privileges, and powers, of which the State cannot divest herself without self-destruction.    Tried by this test, a gold mine cannot be an appurtenance of sovereignty.

The distinction between this general power of eminent domain and the right of property in a particular source of royal revenue, is noticed by the English Judges in the " saltpetre case," reported in 7th of Coke, as early as the year 1608.    The report says : " It was resolved that this taking of saltpetre is a purveyance of it for the making of gunpowder, for the necessary defense and safety of the realm, and for this cause, as in other purveyances, it is an incident inseparable to the crown, and cannot be granted, demised, or transferred, to any other, and cannot be converted to any use than for the defense of the realm, for which purpose only the law gave to the King this prerogative. And it is not like to the mines of gold and silver, for there the King hath interest in the metal."

Here we see the Judges draw a distinction between powers absolutely necessary for the general welfare and those rights of property in which the representative of the crown had a personal interest.    In the latter category are classed mines of gold and silver.    Now, what is there in common between the government of California and the representative of the sovereignty of England, from which we are to infer that every species of personal property conceded to the one attaches to the other?    If it were true that the rights of property in the State of California were to be measured by the claims of the absolute sovereigns of Britain, she would be entitled to all the whale and sturgeon taken on the coast, or in her waters; to first fruits, and tithes, and to all the property wrecked upon her coast.    These were all sources of the ordinary revenue of the British Crown, peculiar to it, exacted in early times by an absolute master, and yielded by an enslaved people.

To sustain this claim upon the part of the State, it is not sufficient to show that this species of property was once vested in the sovereign of Great Britain, but it must appear that it vested in him by virtue of that, which alone the State holds in common with him, the quality of sovereignty.    Now, the only sovereign power to which this right has ever been referred, is that doubtful one of the right of coinage.    In the first place, it is difficult to

perceive how the possession of bullion is necessary to the monopoly of coinage. If the proposition ever presented any difficulty to our inexperienced ancestors, the later experience of European and American governments has abundantly demonstrated, that the power of coinage in the government is entirely compatible with the private ownership of bullion. But if this right to the precious metal depends upon the right of coinage, it must come and go with that right. Now, it so happens, that the sovereign State of California possesses no such sovereign right. *Cessante ratione, cessat lex.*

Although this royal prerogative of coinage may have been the subtle pretense, or excuse, for this claim to the private property of the subject, certain it is, that the funds from this source were not devoted to the creation of a circulating medium, but were mingled with those derived from escheats, fines, deodands, wrecks, etc. and constituted what was called the ordinary revenue of the Crown. When these resources were not sufficient to meet the expenses of the prince's household and the wars he set on foot, the extraordinary measure of a subsidy aid or supply was resorted to. By degrees, these extraordinary sources of revenue, under the name of taxation, as being more equal, and as possessing the advantage of being self-imposed, have superceded the arbitrary and despotic sources of revenue known to earlier times. It is upon this happy change, that Mr. Stephen, the latest and ablest of the commentators upon the laws of England, congratulates his fellow subjects.

"The decay," says he, "of the sovereign's private patrimony ought to be considered, as in some degree, compensatory for the burden of taxation. For, if every gentleman in the kingdom was to be stripped of such of his lands as were formerly the property of the Crown; was to be again subject to the inconveniences of purveyance and pre-emption, the oppression of forest laws, and the slavery of feudal tenures; and was to resign into his sovereign's hands all his royal franchises, of waifs, wrecks, estrays, treasure trove, *mines*, deodands, forfeitures, and the like, many would perhaps find themselves greater losers than by paying their quota of such taxes as are necessary to the support of government."

At the January Term, 1858, BURNETT, J. delivered the following opinion :

On the 29th day of February, 1844, Governor Micheltorena granted to Juan B. Alvarado, a tract of land known by the name of the "Mariposas," to the extent of ten square leagues.  On the 10th of February, 1847, Alvarado conveyed his title, by warranty deed, to John C. Fremont.  The claim was presented to the Board of United States Land Commissioners, and finally confirmed by the decision of the Supreme Court of the United States, at the December Term, 1854.  A survey was made in July, 1855, and a patent issued to Colonel Fremont, February 19th, 1856.  On the 22d day of April, 1857, Colonel Fremont leased a part of the tract, being the premises in dispute, to the plaintiff, for seven years, at a monthly rent of one thousand dollars.  In May, 1851, the defendant, then and ever since, a corporation for mining purposes, entered upon and took possession of the premises, and has continued in possession, working the quartz veins, and extracting the gold therefrom, and has expended, in the erection of machinery and other improvements, upwards of eight hundred thousand dollars.  This action was brought by the plaintiff to recover possession of the property and damages for its detention since the date of the lease.  By a stipulation between the Attorneys, the defendant was allowed to set up in defense any matter that could be the subject of a bill in equity.  The plaintiff had judgment in the Court below, and the defendant appealed.

The case presented by the record is one of the most important that has ever been considered by this Court, not only in regard to the pecuniary value of the subject in controversy, but in reference to the consequences likely to flow from the decision.  We have given to the case that careful consideration which its magnitude demanded.

Under the view we have taken of this case, there are only two positions necessary to be examined :

1.  Whether the title to the mineral passed to Col. Fremont ?

2.  Whether, conceding that it did not, the defendant has the right to extract the gold, while the title in fee simple of the land is in the lessor of the plaintiff?

If the gold in the premises in controversy now belongs either

to the State or to the United States, it does not belong to Col. Fremont, and the effect must be the same upon the right of the the plaintiff to recover.

If we concede, for the sake of the argument, that the "United States could only occupy the position of any private proprietor, with the exception of an express exemption from State taxation; and that the mines of gold and silver on the public lands are as much the property of this State, by virtue of her sovereignty, as are similar mines in the lands of private citizens," as held by this Court in the case of *Hicks* v. *Bell*, (3 Cal. 227,) then it follows that the gold found in the premises in controversy belongs to this State; provided, the title to the mineral did not pass to the grantee by virtue of the original grant. If the State, by virtue of her sovereignty, succeeded to the rights of Mexico in the mines of gold and silver in the public lands, then, upon the same principle, the State must have succeeded to the rights of Mexico to the mines in the lands of private proprietors. It would seem to be impossible to make any substantial distinction between the two cases. We cannot perceive any reason or principle for the distinction. The right of the State must be the same in both cases, for the reason that the right of Mexico, as to the mineral, was the same in both.

But if we take the opposite theory to be true, that the property in the mineral did not pass to the grantee, but passed from Mexico to the United States, and did not vest in the State by virtue of her sovereignty, or otherwise, then the question arises, how did the title to the minerals pass from the United States to Col. Fremont?

In examining the question, as to whether the title to the mineral passed from the United States to the grantee, we must take the decisions of the Supreme Court of the United States as conclusive upon this Court.

The object of the Act of Congress of March 3d, 1851, was, as its title imports, "to *ascertain* and *settle private* land claims in the State of California." The purpose and scope of the Act were only to ascertain and settle *private* titles derived from Spain and Mexico; not to grant *new*, but to ascertain and settle or confirm the *old* titles. Hence, the decree was one simply of *confirmation or rejection.* To confirm is "to make firm or certain; to

give new assurance of truth or certainty; to put past doubt."— *Webster*. The confirmation must be of some title previously existing, and the confirmation only becomes *conclusive* evidence of that which it concedes existed before. Confirmation can only be matter of evidence. It makes certain, gives new assurance, puts past all doubt. The decision was only upon the validity of a pre-existing title. And when the title or claim was finally confirmed, and the patent issued, the final decree and the patent were only conclusive, between the United States and the claimant, as to the matters involved, and no more. The claimant presented *his* petition, setting forth *his* title, and praying for a confirmation of the *same*. When confirmed, he had only the title originally granted, with a "new assurance" of its validity. The effect of the patent was only such as the Act of March 3d, 1851, gave it. The patent could not go beyond the decree of confirmation, and the decree itself could not go beyond the original title. In other words, the decree could not vest in the grantee a title to that which was not included in the original grant.

In the case of *Fremont* v. *The United States*, (17 How. 542,) the validity of his title was confirmed by the Supreme Court of the United States. The opinion was well considered, and distinctly settles positions from which certain conclusions must logically flow. Among the points substantially determined were these:

1. That the Governor had the power to make the grant.

2. That it conveyed to the grantee the title it purported to convey.

3. That the title was in fee.

4. That the grant contained conditions, but these were conditions subsequent.

5. That the definitive grant was "intended as the evidence that the conditions annexed to the grant have all been complied with."

6. That "the right to so much land, to be afterwards laid off by official authority, in the territory described, passed from the government to the grantee by the execution of the instrument granting it."

7. That whatever interest remained vested in the grantee or his assigns at the date of the treaty, "the United States are bound in good faith to uphold and protect."

The conditions annexed to the grant, including the approval of the Departmental Assembly, being conditions subsequent, their non-performance could only *divest* a title *previously vested*. And the effect of the definitive grant being only *evidence* that these conditions had been fulfilled, no title passed by it; but the title must have passed by the original grant, if it passed at all. And it was only such title as existed at the date of the treaty that the United States were bound to protect. They were not bound to make the original grant convey a title to property, which was not included in its terms when issued. In the case of *Osborn* v. *Hendrickson,* July Term, 1857, we held that "parol evidence could not add to the writing a description of property not embraced in it." And so, if the original grant to Alvarado did not convey the title to the mineral, the subsequent confirmation and patent did not do so. This seems to be the result of the Act of March 3, 1851, and the decision of the Supreme Court. In the opinion, the Chief Justice says :

" The only question before the Court is the validity of the title. And whether there be any mines on this land, and, if there be any, what are the rights of the sovereignty in them, are questions which must be settled in another form of proceeding, and are not subjected to the jurisdiction of the Commissioners or the Court, by the Act of 1851."

From this it would seem to be clear that no new rights were subjected to the Commissioners or the Court; and, therefore, the effect of the decree and patent could not be to convey any additional title to the claimant.

If, then, the title to the mineral was reserved by the laws of Mexico when the grant was made, and was still retained by Mexico up to the date of the treaty, this right must have passed to the United States, unless the General Government did not possess the capacity to receive it. The law existing at the time the grant was made entered into and formed a part of the grant, without any express stipulation to that effect. If, therefore, by the terms of the grant, *as* controlled by the existing law, the title to the mineral was reserved to the government of Mexico, that title passed out of Mexico and vested in the United States, or in the claimant; and if it vested in the United States it was either in their own right, or as Trustee for the future State.

It is insisted by the learned counsel for the plaintiff, that "upon the cession of the territory by Mexico to the United States, the sovereign right of Mexico to the mines ceased, and there was no sovereignty to take. The Mexican law of denouncement was gone, for the mines could only be denounced by virtue of her proprietorship. The necessary result was, that as far as concerned mines in granted lands, they went with the land, and became the property of the owner, for the law does not tolerate the want of an owner for any thing of value."

This position of the learned counsel is no doubt true, if we concede that the United States had no *capacity* to take, either in their own right, or as Trustee for the new State. But it is also clear, that if the United States had the capacity to take, in their own right, then the title remains in them, and the State has no more right to the mineral than to the land containing it.

It must be conceded that there are certain inseparable incidents of sovereignty that must exist wherever sovereignty itself is found. Among these is the right to take private property for public purposes, the right of taxation, and the right to control navigable streams. These powers are necessary to the very existence of government. But it is equally true, that there are other powers that may belong to one government, under its own Constitution, that do not belong to another government, based upon different principles. For this reason, only so much of the common law is in force in this country as is consistent with our institutions. There are certain powers inherent in all governments; otherwise, they would not be governments at all. And it is equally clear, that these governments must differ from each other in certain *other* respects; otherwise, they would all possess the same powers.

In the case of *The Queen* v. *The Earl of Northumberland*, (1 Plowden, 310,) the Court of Exchequer decided, after very full argument and great deliberation, that "all mines of gold and silver within the realm, whether they be in lands of the Queen, or of subjects, belong to the Queen by prerogative, with liberty to dig and carry away the ores thereof, and with other such incidents thereto, as are necessary to be used for the getting of the ore." (Id. 336.)

In the argument, the counsel for the Queen based this preroga-

tive upon these grounds: 1. That gold and silver were the most excellent of all things, and, for that reason, belonged to the Queen, as the most excellent of all persons. 2. The necessity of the thing, as the Queen could not maintain an army without treasure. 3. As an incident to the right to coin money.

The last ground is the one given by Blackstone. (1 Com. 294.) "A twelfth branch of the royal revenue, the right to mines, has its original from the King's prerogative of coinage, in order to supply him with materials."

This right of the Crown is, no doubt, the settled law of England, upon whatever reasons it may be predicated. (Bainbridge on Mines, 40.) The different reasons assigned by different writers for this right, seem not to have been satisfatory to those who sustain it. It is the *settled law,* and that would seem to be about all that can be said in its favor.

But in deciding the question, whether the title to the mineral in the premises in controversy, must, of necessity, be either in the United States or in the State of California, it becomes material to consider the reasons upon which this right of the Crown was based. For, though such is the positive law of England, the ground upon which such a rule is predicated may be wholly inapplicable to the nature and powers of our own government. If this right of the Crown be an inseparable incident of sovereignty, then the same right must belong either to the United States or to this State; but if, on the other hand, such right be not, in its own nature, an inseparable incident of sovereignty, then the mineral may, or may not, belong to either government, and may be the property of a private individual.

The incidents of sovereignty are those powers of which a State cannot divest itself, without materially impairing its efficient action. All the powers necessary to accomplish the legitimate ends and purposes of government must be sovereign, and, therefore, must exist in all practical governments.

If, then, we try the question by this test, is a gold mine a necesssary incident of sovereignty?

The first and second reasons assigned by the Queen's counsel, in the case from Plowden, seem to have no force and no application; and the only ground to which this right can be referred with any apparent reason is the power of coinage. The State

does not need the mine for the purpose of revenue, as the power of taxation is ample for that end. And it is difficult to perceive how the title to the mineral is a necessary incident to the exclusive right of coinage. In practice, we see such a theory refuted every day. By the Constitution of the United States, the power to coin money, to regulate its value, and of foreign coin, is conferred upon the General Government; and the States are prohibited from making anything but gold and silver a lawful tender in payment of debts. These provisions, taken together, give all the power necessary to the Federal Government, without the ownership of the materials out of which the coin is made. And, as the State has no power to coin money, or regulate its value, she could have no claim to the mineral upon that ground.

If we consider the positions established by the decision of the Judges, in the Earl of Northumberland's case, and in that of the Saltpetre case, in 7 Coke, 13, it will be seen, that this right of the Crown was not considered as an inseparable incident of sovereignty. In the first case, it was held, "that a royal mine may, by the grant of the King, be severed from the Crown, and be granted to another; for, it is not an incident inseparable to the Crown, but may be severed from it by apt and precise words." (1 Plowden, 336, *a.*) And, in the second case, "it was resolved, that this taking of saltpetre is a purveyance of it for the making of gunpowder, for the necessary defense and safety of the realm; and for this cause, as in other purveyances, it is an incident inseparable to the Crown, and cannot be granted, demised, or transferred, to any other, and cannot be converted to any use, than for the defense of the realm, for which purpose the law gave to the King this prerogative. And it is not like to the mines of gold and silver, for there the King hath an interest in the metal."

The right to royal mines was a personal prerogative of the Crown, like many others, and could be alienated at the pleasure of the King. The right was not, in its nature, an incident of sovereignty; because, such incidents cannot be transferred to an individual without materially impairing the powers of the State.

If these views be correct, there would seem to be no sufficient

reason to sustain the position, that the title to the mineral is in this State. She cannot claim it on the ground of sovereignty, nor upon any other ground that we are aware of; and we are equally convinced, that the United States cannot claim this right upon the ground of sovereignty. But we can perceive no reason why the mineral could not belong to the United States, as well as to any other proprietor. The *capacity* to own the mineral is inherent in both the State and Federal governments. If they possess the capacity to own the land containing the mineral, then they can own the mineral itself. And if the title to the land can be in one party, and the title to the mineral in another, then the title to the premises in controversy may be in Col. Fremont, and the title to the mineral in the United States.

It is true, that the *general* rule of the common law is, that he who owns the land, owns all that the land contains. But, notwithstanding this general rule, the proprietor of the land may sell it, reserving to himself the title to the mineral in the land. There is nothing in the common law, nor in the reason and nature of the case, to prevent parties from making such a transfer of property, subject to such a reservation. Without such a reservation, either express or by the terms of the law then existing, the right to everything contained in the land would necessarily pass by the deed.

The title to the land in controversy was, before the date of the grant, in the Republic of Mexico. By the grant, the title to the land, with a reservation of the mineral to the government, passed to the grantee. This right of Mexico was a public right— a right of property in the nation; and, in the language of the Supreme Court of the United States, in the Fremont case, "passed with all other public rights, to the United States." (17 How. 565.)

It does not matter upon what ground the Republic claimed this ownership, nor in what manner she exercised such a right; while she could not transfer her functions to the United States, she could transfer her right of property in the public lands, and the right to minerals in the lands of individuals. The United States could receive this title to the minerals, and could enforce the right in any form, or by any proceeding consistent with the frame of the government, and the substantial rights of the land-

ed proprietor. The mere change in the *mode* of asserting or exercising the right, would not defeat the right itself, unless this change materially impaired the rights of the other party.

The legislation of New York and Pennsylvania is not opposed to the view we have taken, but supports it. Those States claimed the mines of gold and silver within their respective limits, for the reason that the King of Great Britain had never granted them to individuals at the date of the treaty acknowledging our independence. The right of property in these mines, being in the King, passed to the States in which they were found. The Federal Government, under the old Confederation, could take no title. And this legislation is based upon the principle that the ownership of the mineral may be distinct from the title to the land, and that this right in the State was not incompatible with her Constitution, or with her relation to the Federal Government, or with the rights of the landed proprietor.

Our conclusion upon this branch of the case is, that the right to mines of gold and silver found in the lands of private persons was a personal prerogative of the British Crown, and not based upon any right incident to sovereignty; that such a right is not incident to our governments, either State or Federal, but that the *capacity* to own land and all that it contains is possessed by both; that the capacity to own, and the fact of ownership, are distinct things; that the title to the gold, in the premises in controversy, in this case, was reserved by Mexico, and passed, by treaty, to the United States, and has not passed from them to the lessor of the plaintiff.

The second and last position to be examined is, whether the defendant has the right to extract the gold, while the title in fee simple of the land is in Colonel Fremont.

The learned counsel for the plaintiff insist that, conceding the title to the mineral to be in the State, this fact cannot help the defendant. If this ground be correct, conceding the ownership to be in the State, it must be equally correct, if the ownership be in the United States. They insist that a party has no right to enter upon the land of another to search for gold, because the gold belongs to a third party; not even under a general license from the owner of the gold. It is conceded that the State, as the owner, might protect the party licensed against a trespasser, in such a case.

But we cannot perceive the force of this reasoning. The right to the gold carries with it the right to search and dig, as necessary incidents, as was held in the case from Plowden. The ownership of the mineral would be of no value without the right to extract it. And this right in the government could only be exercised through its agents. The owner of the gold, whether a natural or artificial person, could do that by agent that could be done by the principal. The right to grant a license to another is not injurious to the owner of the land, but beneficial to the owner of the mineral. Of course, the party licensed could do no more than the proprietor of the gold could do.

The only remaining inquiry is, whether the defendant, under the circumstances, has a license from the United States. This question was very fully considered by this Court in the case of the *Merced Mining Co.* v. *John C. Fremont et als.* decided at the last April Term. In that case, we said : "When we consider the current and the spirit of the legislation of both governments, taken in connection with the history and the known circumstances of the country, the conclusion is irresistible, that the mines are occupied and worked with the clear assent and encouragement of both governments. And while the terms of this license and the relation which the miner sustains to the superior proprietor may not be expressly laid down, and the duration of the estate not clearly designated by any positive law, and we may not, for these reasons, be able to give any exact definition of the precise nature of the right, yet one thing is well understood and indisputable : they are there by the clear license of both governments, and have such a title as will hardly be divested, even by the act of the superior proprietor. There are equitable circumstances connected with these mining claims that are clearly binding upon the conscience of the governmental proprietor, and that this Court must, with all due respect, presume will never be disregarded. If these views be correct, the owner of a mining claim has, in *practical effect*, a good vested title to the property, and should be so treated until his title is divested by the exercise of the higher right of the superior proprietor. His right and remedies, in the meantime, are not trammeled by the consideration that the higher right to reclaim the property exists in another, which right may *possibly*, but will not

21

*probably* be exercised. His right to protect the property for the time being, under the peculiar circumstances of the case, is as full and perfect as if he was the tenant of the superior proprietor for years or for life."

We have seen no reason to change the views we then expressed. These views are as applicable to this case as to the one then before the Court. We can see no reason or equity in allowing the plaintiff to turn off the defendant for doing that which is no injury to the right conveyed by the grant to Alvarado. As Colonel Fremont had no title to the mineral himself, and could only take it as any other individual, his tenant has no such interest in the premises as will entitle him to recover. The defendant occupies simply and solely for mining purposes, under the general license of the Federal Government. It is very true, that there has been no express Act of Congress creating this license. But the circumstances are peculiar. Had the government simply permitted persons to occupy its lands for agricultural or mechanical purposes, when such occupancy could not impair, but enhance, the value of the property, then the implication of a license would not be so strong as in the case of mineral lands, where the property is continually and rapidly wasting away under the process of mining, which, in fact, removes all that is of any value in the estate itself. We cannot, under such circumstances, believe that the government intends to object. It must be its will that the mineral should be thus taken. And if this be its will, no one else can complain.

For these reasons, the judgment is reversed and cause remanded, and the Court below directed to enter judgment for the defendants.

TERRY, C. J. delivered the following opinion :

I concur in the judgment and the doctrine of my associate. I, however, express no opinion as to the correctness of the former ruling of this Court in *Hicks* v. *Bell*. It is sufficient, for the purposes of this case, that the title to the gold did not pass by the grant to the lessor of plaintiff. Whether the right to the mines is vested in the United States, or the State of California, is a question in which the plaintiff has no concern.

FIELD, J. dissented.

A rehearing having been granted, the case was again argued at the July Term, 1858.

*S. W. Inge,* for Appellant.

1. In California, the mines of gold and silver within her limits, whether in public or private lands, belong to the State, by virtue of her sovereignty. The proprietary right to the mines is incident to the sovereign rights of eminent domain and municipal jurisdiction, both of which are in the State. The State owns the precious metals, as she owns the flowed lands, by the same right, and upon the same principles, and as the original thirteen States owned them. (9 Por. 591; 10 Pet. 736; 3 How. 212; 17 Id. 542; 3 Kent, 425, 427, 401, Note 0; 1 Com. 220, and authorities referred to by Judge Heydenfeldt.)

2. California was admitted on an equal footing with the original States, and without these sovereign rights she would not be an equal, but an inferior.

3. It is too late now to deny the ownership of the State, as the Federal Government has always admitted it—by its legislation in some instances, its failure to legislate in others, and by its whole public policy on the subject.

a. In the Act admitting California, the Federal right to the public lands is reserved, but no mention is made of the mines, although it was contended in debate that the omission of the mines was an abandonment of them to the State.

b. By subsequent legislation and exercise of ownership over the public lands, carefully and expressly exempting the mines from the operation of her land laws, thereby leaving them to the control of the State.

c. By the long acquiescence of the Federal Government in the case of *Hicks* v. *Bell,* in which this Court decided five years ago, (and have reaffirmed the same principle at almost every succeeding term up to this time,) that the mines were the property of the State.

d. By its acquiescence in the operation of the same principle by the legislative department of this State, from the meeting of the first California Legislature to the adjournment of the last. (See Statutes of the State.)

The only point of difference between the adverse counsel and

myself in the oral argument was, as to the capacity of the Federal Government to take the proprietary right to the mines under the treaty, and to hold them in trust for the new State; he contending that she could not, and hence they vested in Fremont by operation of law, and upon the principle that the common law will find an owner for everything of value. But, an examination of the case of *Pollard's Lessee* v. *Hagan*, will show, that the United States may take and exercise the rights of eminent domain and municipal jurisdiction in the territories, and the rights of property incident thereto, until the creation of a State, whereupon those rights, sovereign and proprietary, vest in the new State. This point is expressly settled in the case of *Goodtitle* v. *Kibbe*, (9 How. 471,) which forever disposes of the question.

The opinion of the Court overruling *Stokes* v. *Barrett*, (5 Cal. 36,) and *Tartar* v. *Spring Creek Co.* is correct. The Act of April 20th, 1852, did not give permission to all persons to work the mines on public land in the possession and enjoyment of another for agricultural purposes, as is said in the former case. The whole scope of the Act is to give a remedy to maintain and defend possession of the land. The proviso in Section 1, in regard to the mines, gave no right to the settler, but was intended to guard a pre-existing right in the public, to wit: a right to work the mines of precious metals, whenever and wherever found, in public or private lands. The only effect of the proviso is, by declaring the law, to relieve the Court from the necessity of inquiry upon that point. Without the proviso, the law would be precisely the same.

*Halleck, Peachy & Billings,* and *Gregory Yale,* also, for Appellant.

I.   The Laws of Spain and Mexico recognize two distinct interests in land — an agricultural or pastural interest, and a mining interest. The first is described as a property in the surface, (*la propiedad del suelo*,) and the other as a property in the mineral, (*la propiedad de la mina*.) Both of these interests, in the substance of which the earth is composed, are considered as interests in land, or real estate, and as corporeal hereditaments; and both belong to the class variously denominated

in Spanish law, "*bienes raices*," "*fundos*," "*heredades*," "*tierras*," "*posesiones*," "*predios*," which are the equivalents of the common law term, "land." A mine is, in Spanish law, as much land as any other part of the earth's substance. (Gamboa, Heathfield's Translation, Vol. 1, p. 30; Vol. 2, pp. 258, 265; Lares, Derecho Admin. 87, 93; Rockwell's Spanish and Mexican Law, 135; Recopilacion de Indias, *b.* 9, Tit. 27, Laws 31, 32, 34.)

II.   These rights, or interests in lands, were not only regarded as distinct in their nature, but they were acquired, held, and transferred, by separate and distinct titles. The first kind of interest, or a property in the surface or soil, was conveyed by the sovereignty to individuals, or to corporations, by deeds of purchase, by grant, or by gift; that is, for a pecuniary consideration, for services rendered, in colonization, or as a gratuity. So, also, of the second interest, or a property in mines; it was conveyed by registry of discovery, by denouncement for non-working, by sale, by contract, or by special gift. (Gamboa, Commentaries, Vol. 1, p. 139; Rockwell's Spanish and Mexican Law, 50, 51, 72, 76, 170, etc.; Ordenanzas de Mineria, 69, 70, 72, 73, 79, 114; Escriche, Dic. Verb. Mina.)

III.   Every grant or title of the property of the soil for pastural, agricultural, or domestic, purposes, was subject to the reserved rights of the government in the minerals found in the ground—the mining right and its incidents—which were paramount. So of a mining grant; it conveyed no rights to the surface or soil, other than those incident to the mine itself. The agricultural or pastural grant, (or title to the soil,) could not prevent or interfere with a mining grant, (or title to the minerals,) in the same parcel of land; nor could such grant, or title to the minerals, prevent or interfere with a grant, or title to the surface, for other purposes. As already stated, one was a surface property, and the other a subterranean property. (Lares, Derecho Adm. 87; Ordenanzas de Mineria, 75; Gamboa, Com. Vol. 1, p. 25.)

IV.   In order that the owner of one interest might exercise his rights of ownership without interfering with the rights of ownership of the other interest in the same land, regulations were established for the exercise of these respective rights of

Biddle Boggs *v.* Merced Mining Co.

property. Thus, there was the reserved right of entering upon land granted for agricultural purposes, to search and dig for minerals, and, if any were found, a reserved right to use a certain portion of the surface for the purpose of extracting and working the ores. But, in making such search for minerals in the ground, the vines, crops, fruit trees, buildings, etc. of the surface owner, were not to be injured; and if, in working mines so discovered, damage resulted to the surface owner, he was entitled to be remunerated by the mine-owner, or mine-worker, for such damages, after having it assessed in the manner provided by ordinance. In other words, all grants of land for agricultural, pastural, or domestic, purposes, were subject to the reserved right of the government to the mines in such land, and to such portions of the surface appurtenant as might, in the discretion of the government, be necessary to their possession or working; and all grants of mines, however made, carried with them only so much of the surface of the land, as, under the regulations of the government, was made an appurtenance thereto. These *pertinencias*, or appurtenances, were incident to the mines, and always went with them; they were of the same dignity as the right to the mines themselves, and were, in fact, regarded as a part of them. (Lares, Derecho Adm. 93; Ordenanzas de Mineria, 74, 75.)

V. The grant, (by the Mexican Government,) to Alvarado, of the Mariposa Rancho—whether it be regarded as a sale, a grant in remuneration for services, or in colonization, or a pure gift—whether it was an inchoate or a complete title—whether a mere equity, or in full property—was a grant of the soil, or surface, (*la propiedad del suelo,*) and not a grant of the minerals in the ground, (*la propiedad de la mina;*) it was a grant for agricultural, pastural, and domestic, purposes, and not a mining grant, for digging ores and extracting minerals. It was, therefore, subject to the right of the government to such minerals as were, or might be, discovered in it, and to the appurtenances incident to such mines. This doctrine was established in Spain centuries ago. (Partida 2, Law 5, Tit. 15; 1 Gamboa, 17; Rockwell, 124.) It follows, then, that the property of the mines and their appurtenances, in the Mariposa tract, remained in the Mexican Government, and was not conveyed to Alvarado; he

acquired by his grant, under the Mexican laws, no right or claim to them. The title which he conveyed to Fremont was that which he had received from the Mexican Government, and none other. When California was ceded to the United States, Fremont held a title, or claim, to the surface, of ten leagues of land, and the Mexican Government still retained the ownership of the mines in the ground covered by Alvarado's grant, and of their appurtenances. This was the legal condition of the parties at the date of the cession. (Vide, also, Lares, Derecho Adm. 87.)

VI. We now come to the question, in what manner was this property or ownership, which the Mexican Government then had in these mines, disposed of? When, and to whom was it conveyed? or what became of it when the sovereignty was changed, and California passed from the Republic of Mexico to the United States?

Two solutions have been given to this question. The first, that this property in the mines, belonging to the government of Mexico, passed, by the treaty of cession, "with all other public rights, to the United States." (*Fremont* v. *United States*, 17 How. 565.) The second solution is, that these minerals belonged to Mexico, not as public property — a right of property in the nation—but as a part of its *jura regalia,* which, on the admission of California as a State, pertained to the State in virtue of its sovereignty. The latter view is held in *Hicks* v. *Bell,* (3 Cal. 225,) and the former by Mr. Justice Burnett, in the opinion delivered in this case on the former hearing.

1. On the supposition that they passed to the United States:

If the first solution be correct, we must next inquire whether the property in these minerals, which thus passed to the United States, remains so vested in them, or whether it has been conveyed to Fremont, and if so conveyed to Fremont, when and how was it passed by the United States to him? Certainly not by the action of the Commission, for that tribunal could only confirm or reject the title which he had set forth in his petition, and which he had derived from Mexico; its decree could not go beyond the original title thus presented. It certainly was not passed by the decision of the Supreme Court, for Chief Justice Taney says, in that decision, " The only question before the Court is the validity of the title, and whether there be any

mines on this land, and if there be any, what are the rights of
the sovereignty in them, are questions which must be settled in
another form of proceeding, and are not subjected to the juris-
diction of the Commissioners, or the Court, by the Act of 1851."
If, therefore, it passed at all, it must have passed by the patent,
which was issued in virtue of that Act.   But if no new rights
were subjected to the jurisdiction of the Commission, or the
Courts, by that Act—if they could not entertain the question of a
right to the minerals in this land, and if the patent was based on
the final decree in that proceeding, and derived all its force and
effect from the proceeding and final decree under the Act, how
could it convey any additional title to the claimant?   The effect
of this final confirmation, and of the patent under it, was merely
to give " new assurances " of the validity of the title which he
already held—to make complete a title which may have been
inchoate—to make legal what may have been only equitable—
in fine, to perfect what Mexico had intended to perfect, but may
have left incomplete.

That the law of March 3d, 1851, was intended merely to con-
firm existing rights without conferring new ones—to give " new
assurances " of validity to titles already held by claimants, and
not to confer upon claimants property to which they had no
title—is evident, not only from the words of the law itself, and
the construction put upon it by the Supreme Court, but, also,
from the entire tenor of the discussions in the United States
Senate when the law was passed.   Not a single Senator regarded
this law as conferring upon the claimants any new title to prop-
erty, and all regarded the patent to be issued on the final con-
firmation of the claim as simply evidence of such final confirma-
tion.   (Congressional Globe and Appendix, Vol. 23, pp. 427, 429;
*Fremont* v. *The United States*, 17 How. 565.)

We come to the question of the right of Fremont to eject, as
a trespasser, any one who enters upon the land to search for or
work these mines.

There can be no question that the United States, or any one
having a vested interest in the minerals in this land, has a right
to search and dig for them, as necessary incidents to such prop-
erty or vested interest; for, the ownership of the mineral would
be worthless without the right to extract it.   It has been de-

cided, by the highest authority, that the owner of mines in the lands of another, has a right to enter and work them, "without the concurrence of the owner of the surface." (Rockwell, 520; *Earl of Cardigan* v. *Armitage*, 2 Barn. & Cres. 197; 3 Durnford & East, 414.) Moreover, the owner of the mines may license a third party, and the party licensed may do what the principal could, and no more. The granting of such a license would be no injury to the owner of the surface, and a benefit to the owner of the mineral. The right to give the license, therefore, cannot be denied. But has any such license been issued? and, if not, how can the defendant in this case exercise a right which, by hypothesis, belongs to the United States, as principal, to whom the defendant does not hold the relation of agent? No special license from the United States to the defendant is alleged in this case, nor is it pretended that any general license, or public dedication of the use of these mines, has been made by Act of Congress. Can the mere permissive use of them to·the public, since the acquisition of California, be construed as a general license? Can this, of itself, be regarded as vesting in the public such an interest, or right of use in the minerals, as to carry with it the right to enter upon private land for the purpose of searching and digging for them? It must be admitted that these questions are not without their difficulties, and, in order to obtain a proper solution, we must recur to the laws of Spain and Mexico.

Philip II, after vesting in the crown all mines, "wheresoever situate, and whether in public or private ground," granted permission to all persons, whether natives or foreigners, to search for mines, and declared that "they shall be theirs in right of possession and property," subject to the laws with respect to working, and the payment of duties. (Recop. de Castile, Law 4; Tit. 13, b. 6, and Law 5, Tit. 13, b. 6.) And in the Indies he authorized all his subjects "to work mines freely and without impediment, and making them common to all persons wheresoever situate." (Recop. de Indies, Law 1, Tit. 19, b. 4.)

When Mexico acquired her independence of Spain, it was considered that the new State was vested with all the rights of the crown of Spain, with respect to mines. The ownership of all ungranted mines was, therefore, regarded as vested in the nation, subject to the general right of the public to search and dig for

them, "whether in public or in private ground," as had already been granted by the crown of Spain, and the right of individuals to acquire private ownership in particular mines in the manner provided by the laws and ordinances in force.   Moreover, the titles acquired by individuals were considered as derived from the nation, and as of the same character as when derived from Spain, that is, conditional—limited titles—subject to denouncement and defeasance, and on defeasance they reverted to the nation. (Gamboa, Com. Vol. 1, p. 28, etc.; Rockwell's Spanish and Mexican Law, 133, etc.; Lares, Derecho Adm. 91—93; Decretos, Oct. 7th, 1823, and March 11th, 1842; Ordinanzas de Mineria, 68, etc.)

But it is said that this right of entry upon private lands for mining purposes, was conditional, upon the payment to the owner of the land, the damages consequent upon the entry, and that, without the payment of such damages, no right of entry existed.   Neither the right of entry upon private lands, to search for mines, nor the title acquired by registry, or denouncement of mines, discovered in private lands, was conditional upon the payment of damages; nor did any forfeiture result from a refusal to pay such damages when properly assessed.   When the "damages which immediately follows" to the surface of private lands had been assessed in the manner provided by the ordinances, and the mine-searcher or mine-owner refused to pay them, the remedy was by execution, as in any other case of judgment debt.   (1 Gamboa, 133—135.)

Such was the condition of this class of property in Mexican territory, and such the relative rights of the government, the people, and private individuals, respecting it, when the sovereignty of California was again changed, and the United States acquired it as " ceded conquered territory."  (*Cross et al* v. *Harrison*, 16. How. 191.)   Did this second change of sovereignty have an effect different from the first upon the relative rights of the government, the public, and individuals, with respect to mines, whether in public or private lands ?

This question may be considered in two aspects : 1st, with respect to the rights of individuals *inter se*, and, 2d, with respect to the government as the owner of ungranted mines, and the rights and uses which had been vested in the public by the former sovereignties.

1. A change of sovereignty does not, *per se,* affect the rights of individuals in their relations with each other. The relative rights of the individual land-owner, and the individual mine-owner, or mine-searcher, are, therefore, *prima facie,* the same after as before the conquest and cession. Any change of the laws regulating these rights does not affect the rights themselves.

2. If the governments of Spain and Mexico had granted, or dedicated to the public, certain rights and uses in minerals, lands, or other property, of such governments, the transfer of the title of such property to the United States, would not, *per se,* destroy these rights and uses. On the contrary, this title, or ownership, is still, *prima facie,* subject to these rights, and charged with these uses. Even admitting that they may be extinguished, it must be shown that they have ceased by the expressed will of the new sovereignty, or because they are repugnant to its constitution, institutions, or laws. We see nothing in the character of these rights and uses repugnant to the Constitution and laws of the United States, and certainly Congress has not expressly abrogated them.

It is proper here to distinguish between the right to search for and dig minerals, the public use of them as the property of the government, and the right to acquire individual titles to them by certain acts, as registry, denouncement, etc. It is not claimed that the law respecting the acquisition of private ownership in mines continued after the change of sovereignty; that law would necessarily cease without some express provision continuing it in force.

We now come to the consideration of the action of the United States, as the owner of the minerals in public and private lands in California, with respect to their use and enjoyment; and we hold that, as far as the gold mines are concerned, that action has been a virtual confirmation of the dedication, or grant, of them to the public, made centuries ago by Spain, and recognized by Mexico as its successor, without, however, the obligation to pay to the government any portion of the proceeds. Such dedications are recognized both by the common and civil law, and may be made by the government or by individuals; they are good, although there may be no grantee *in esse* capable, at the time,

of taking them, and may be made by parol, as well as by writing, or by deed; they may be inferred from long use, and from the action or inaction, speech or silence, of the original owner, and from the various circumstances of their use by the public. (Bouvier's Law Dic. Verb. Dedication; *Town of Pawlet* v. *Clark*, Cranch, 292; *McConnell* v. *Lexington*, 12 Wheat. 582; *Barclay* v. *Howell*, 6 Pet. 498; *City of Cincinnati* v. *White*, Id. 431; *New Orleans* v. *United States*, 10 Id. 662; *Mayor* v. *Hopkins*, 13 La. 331; *De Armas* v. *Mayor*, 5 Id. 148.)

The length of time which property, of any kind, has been used by the public is, sometimes, an important item as evidence of dedication by the owner, but only to establish a presumption, or to prove the intention. Where the intention itself is evident, time is not an important element. (Bouv. Law Dic. Verb. Dedication; *Daniel* v. *North*, 11 East, 376, and Note; *Antones* v. *Esclava*, 9 Pet. 527; *Blair* v. *Odin*, 3 Texas, 288.)

If the right to search and dig for minerals in public and private grounds had been granted forever to the public by Spain, and such grant was recognized by Mexico, that right remained in the public, notwithstanding the cession of California to the United States, and its exercise must be regulated by the State and the people; the Federal Government cannot interfere. So, also, with respect to these minerals, when discovered, and when the mines are worked; if the use, subject to certain restrictions, belonged to the public at the time of the cession, and has ever since been tacitly permitted by the United States, it is only subject to be regulated or restricted by the State or people, and not by the Federal Government.

The transfer of the legal title in these minerals, to the United States, may have enlarged these uses by removing the former restrictions upon them, by no longer subjecting them to the former right to acquire a limited individual ownership in parts of them, and by exempting those who worked them from the former government dues; but it could not extinguish the uses themselves; it could not destroy the rights which the public had in them before the cession. And these rights and uses must now be regulated by the State and the people of California, and not by the Congress of the United States; for, as such powers are not granted by the Constitution to the Federal Government,

they are necessarily reserved to the individual States, and can only be exercised by them.    (*New Orleans* v. *United States,* 10 Pet. 736, 737; *Alemany* v. *The United States,* Opinion Board Land Com. 609.)

Where a mine had been reduced to private ownership, under the mining ordinances, the public use of that mine ceased, (except the public right to enter and reopen an abandoned mine, and to denounce it for non-working,) so long as it continued to be private property.    This right of denouncement, although a part of the grant by Spain to the public, ceased on the change of sovereignty by cession to the United States, for our laws do not recognize such a proceeding as the general denouncement and defeasance of titles to property.

But it may be said, that this grant, or dedication, of all mines to the public use, is entirely inconsistent with the right granted to individuals of acquiring an ownership in any particular mine.

There is no conflict in the two grants, or rather, in the two classes of rights, conferred by the same grant.    As before remarked, the uses granted to the public—the right to search for, dig, and work, mines—were made subject to the ordinances which permitted the acquisition of a limited private ownership of mines; which ownership, however, was subject to defeasance, and to the right of the public to denounce it for non-compliance with the ordinances on the part of the owner.    The general ownership of all mines in the Crown, or State, the general uses in the public, and the particular right in individuals to acquire certain conditional limited titles to mines, were all parts of the same general system, and the rights of neither one were inconsistent with those of the others.

2. On the supposition that the mines passed to this State:

We will now consider the second solution, viz: That these minerals did not belong to Mexico, as public property, but as a part of its *jura regalia,* or as an essential appurtenance to its sovereignty, which could pass to the United States only to be held in trust for the future State, and which, on the admission of California into the Union, on the same footing as the original States, pertained to the State in virtue of its sovereignty.    (*Hicks* v. *Bell,* 3 Cal. 225.)

We think the premises of this argument untrue, its reasoning,

to say the least, very unsatisfactory, and the conclusion entirely too broad.

The argument assumes that these minerals belonged to Mexico as a part of its *jura regalia,* or as necessary incidents to its sovereignty. On the contrary, we think, mines were regarded as public property; they were held by Spain as the property of the Crown, and by Mexico as the property of the nation, in precisely the same way as the surface of the public lands was held as property. Gold and silver mines were held in no different manner from mines of lead, iron, quicksilver, plumbago, and other metals, or salt springs, ponds, reservoirs, etc. All these were the property, under Spain, of the Crown, and, under Mexico, of the nation—public property. (Gamboa's Com. Vol. 1, p. 15, *et seq.;* Rockwell's Spanish and Mexican Law, 124, *et seq.;* Recopilacion de Castile, b. 6, Tit. 13, Law 5; Recopilacion de Indies, b. 4, Tit. 19, Law 1; Ordenanzas de Mineria, 68.)

If, then, the right of Mexico to mines in public and private lands was a right of property, and not merely a *jura regalia,* essential to sovereignty, and, therefore, following the sovereignty wherever it went, did this property pass to the United States by the cession of California, to be held by them as property, or merely to be held in trust for the future State? This must depend upon the nature and character of the property itself. If it was of such a character as not to bring it within the delegated powers of the Federal Government, it was simply held in trust by the United States for the future State of California. But we can see nothing, in the character of the property in mines, which would preclude the Federal Government from holding it, any more than in holding the property of the surface, or soil. Both, as already stated, were properties in land—in the substance of which the earth is composed. We are, therefore, of opinion that the legal title to both was vested, by the treaty, in the United States, to be held as property, but subject, nevertheless, to the uses which had previously been granted to the public, and that these uses are under the exclusive direction and control of the State, and cannot be interfered with by the Federal Government, notwithstanding it is the holder of the legal title in all ungranted mines in the ceded territory at the time of the treaty.

But the solution of this question is not necessary in this case;

for admitting that the State has succeeded to all the rights of Mexico in the mines of gold and silver in California, whether as property or as *jura regalia,* we cannot perceive that it changes the relations of the parties to this suit. The position of the plaintiff is the same whether the title to these minerals was vested in the United States, or the State of California. On neither supposition is the title in him. If they passed to the State, they were charged with the same uses to the public as if they had passed to the United States, and in either case these uses are to be regulated by the State, the Federal Government having no such municipal power within the limits of a State of the Union. As these mines have never been reduced to private ownership, they are still open to the public, for neither the State nor the Federal Government has ever attempted to extinguish the rights and uses granted to the public by the former sovereignties; on the contrary, both have recognized and permitted them. Moreover, the State has passed laws to induce the public to invest capital in the working of these mines, by regulating, *inter se,* the rights of individuals who have thus invested.

VII. Much has been said about the hardships of the decision of the Court in this case upon individuals who have purchased lands in this State on the supposition that they thereby acquired a title to the minerals in the lands so purchased; and this point has been urged in a most earnest and emphatic manner.

We are unable to perceive this alleged hardship. There are no titles to lands in this State which were not derived either from Spain, Mexico, or the United States. Neither of these have attempted, by their grants or patents, to convey titles to the minerals in the land. In the grants of land by Mexico, the minerals therein were reserved by law and by the uninterrupted usage of centuries; and the patents by the United States on these grants do not purport to convey anything more than was granted, or intended to be granted, by Spain and Mexico. This the subsequent purchasers were bound to know. But it said the decisions of this Court in *Stokes* v. *Barrett,* (5 Cal. 36,) and *Tartar* v. *The Spring Creek Co.* (Id. 396,) have induced purchasers to believe that by purchasing titles to land, they also purchased titles to the mines in the land, and that thus having "bought the lands, and invested their money," under "the rule of property"

thus established by judicial decision, "the rule must be *stare decisis*." We are unable to perceive any substantial grounds for such an inference. There is nothing in either of the decisions above referred to, from which these purchasers had any right to infer that, in buying titles to lands in California, they also bought titles to the minerals in such lands. On the contrary, we think, this Court had signified its opinion that the minerals were not included in such titles. In none of these cases was it intimated that a title to land, like this of Fremont's, included the mines in the land. It has been held by this Court, that miners upon public land, were not authorized "to invade for mining purposes a town lot, built upon and used as a tavern and stable yard," or to divert a stream of water, to the injury of a mill-owner on the same stream, and it has affirmed a judgment for damages to such mill-owner; and it cannot be doubted, that this Court will hold miners upon private lands, responsible for all consequential damages done to the owner of the surface. It has already been shown that the Mexican laws recognized the right of the surface owner to such damages, and provided for their assessment and recovery. The repeal of the Mexican laws may have changed the remedy, but it has not destroyed the right. If our statutes are defective in this respect, they may be amended, or relief may be afforded by the equity side of the Courts. We, however, can perceive no difficulty in this matter. In the English law and system of pleading, a distinction is made between these different kinds of damages, and the different remedies to be applied. Thus, the injuries resulting from an unauthorized entry are direct, and the subject of trespass; but, if authorized, there is no trespass, and the injuries are consequential, as distinguished from direct, and the remedy is case. This distinction in pleadings does not exist with us; but it by no means follows that our system allows no remedy in such cases. (Collier's Law of Mines, 83; *Scott* v. *Shepperd*, 1 Smith's Lead. Cases, 210; *Rush* v. *Heinman*, 1 Bos. & Pul. 404.)

The grant to Alvarado was not as owner "in fee," for fees are not known to the Mexican law; it was as "owner in property" —*dueno en propiedad—la propiedad del.* A fee simple to land in England, does not necessarily include the mines in that land. (*Barnes* v. *Mawson*, 1 Maule & Sel. 82.) A may therefore hold a

fee simple in land, and B a fee simple in mines beneath the same land. A may take livery of seizin of one, and B of the other; A may have a perfect estate of inheritance in one, and B in the other. The widow of A may be dowable of the land of A, and the widow of B, of the mines of B, in the same land. Notwithstanding the common idea of the English law, that property in land extends from the center of the earth to the heavens, it is well settled that this property need not be held by one person, or under the same title. The English law recognizes the same general division of property in land, as that established by the Spanish and Mexican law. (Rockwell, 520, 530, 534, 536, 537, 543, 548, 550; *Comyn* v. *Kyneto*, Coke Jac. 150; *Jones* v. *Maunsell*, 1 Douglas, 305; *Stoughton* v. *Leigh*, 1 Taunt. 402; *Field* v. *Beaumont*, 1 Swans. 304; *Boyce* v. *Green*, Batty, 508; *Rowe* v. *Grenfel*, Ryan & Moody, 396; *Rowe* v. *Grenfel*, 21 Eng. Com. Law, 470, 471.)

The general rule of English law is not disputed; but the rule itself is, as already shown, by no means universal, even in England. Whole districts of country are not subject to it, and in other districts there are numerous exceptions which destroy its universality. Moreover, a title to land in England, with actual possession of the surface, is not always even *prima facie* evidence of title to minerals in the land. (Thierry's Hist. Norman Conquest of England, passim; Collier on Mines, 18, *et seq.*)

It is, therefore, not true that the Courts of England have recognized any such universal rule, as that the land-owner is the owner of everything on and in the land, and that an entry upon private lands for mining purposes is an invasion of private rights —a trespass. Nor has any such universal rule been adopted by the American States. (Kent's Com. Vol. 3, p. 378, Note; N. Y. Revised Stat. Vol. 1, p. 322.)

Other authorities might be referred to, showing that this division of property in land—that one person may have a property in the surface, and another a property in the minerals under the surface—is recognized in the United States as well as in England, or in Spain and Mexico.

To resume the argument in behalf of Appellant, our points are :

1. The laws of Spain and Mexico recognize two distinct inter-

ests in land: an agricultural or pastural interest, and a mining interest.

2. These interests were held and transferred by distinct titles.

3. All grants for agricultural, pastural, or domestic, purposes, were subject to the reserved rights of the government to the minerals in the land, and the use of so much of the surface as might be required for the working of these minerals.

4. Grants of mines carried with them, as incidents appurtenant, the use of certain portions of the surface, but did not prevent a grant of that surface to individuals for agricultural, pastural, or domestic, purposes.

5. The laws of Spain and Mexico regulated the enjoyment of these separate interests in the same land, so that the exercise of the one ownership should not interfere with that of the other.

6. The grant to Alvarado was a grant of the surface, for agricultural, pastural, and domestic, purposes, and did not convey to him any right to the minerals in the land.

7. The patent issued by the United States to Fremont, neither conveyed, nor was intended to convey, anything more than what the Mexican Government had conveyed, or had intended to convey, to Alvarado.

8. The King of Spain granted permission to all persons to search for mines and to work them freely and without impediment, making them common to all, wheresoever situate, and whether in public or private ground.

9. These grants to the public included the right to acquire individual ownership in particular mines, according to the ordinances, and the uses thus granted to the public were limited by the reserved right of the crown to confer such individual ownerships.

10. These general grants did not separate the mines from the royal patrimony, for the legal title still remained vested in the crown, the grants being in use and not in property; but grants to individuals, or titles acquired by individuals, in particular mines, were both in property and possession, the crown retaining only its *alto dominio*, or right of eminent domain; on denouncement and defeasance of these private ownerships, the legal title reverted in the crown.

11. These several interests in mines—the legal title in the

crown, the right of the public to search for and work ungranted mines, the right of the crown to confer, and of individuals to acquire, private ownerships, with the right of eminent domain still remaining in the crown—were perfectly consistent with each other, and were all defined and regulated by the mining ordinances.

12. When Mexico became an independent State, she recognized these general grants, adopted the same system of property in mines, and continued in force the same general laws relating thereto, the republic or sovereignty of the nation, being regarded as succeeding to the rights and obligations of the crown of Spain.

13. If the legal title to the mines in California passed from Mexico to the United States, and is still vested in the United States, it was, nevertheless, subject to certain rights and charged with certain uses in the public, which rights and uses must be regulated by the State, and do not come within the constitutional powers of the Federal Government, after California was admitted into the Union on an equal footing with the original States.

14. If the legal title to these mines has passed to the State of California, by virtue of its sovereignty, it is, nevertheless, subject to the same rights, and charged with the same uses in the public, as if it were still vested in the United States.

15. On neither of these suppositions is the title to the mines in the plaintiff, as the owner or lessee of the land under the grant to Alvarado, and the patent to Fremont; and, on either supposition, certain uses in these mines are in the public.

16. In either case, the entry of defendant was authorized, and not a trespass, and, although he may be liable to consequential damages, he is not liable to direct damages, and cannot be ejected.

17. Even admitting that the United States patent vested in plaintiff's lessor a fee simple title, which, by the English common law, would carry with it the presumption of ownership of everything in the land, this presumption is, according to the decisions of English Courts, rebutted by the fact that plaintiff has never been in the possession and enjoyment of these mines, and, therefore, he cannot recover in this suit.

18. The English common law, and the English Courts, recog-

nize distinct ownerships in the surface of the earth and in mines under the surface, both of these interests being regarded as real estate, as corporeal hereditaments, as land; the adoption of the English common law in California, therefore, does not render these distinct ownerships, or interests in land in this State, inconsistent or incompatible, nor does it make the owners of land in California necessarily, and of consequence, the owners of the minerals in that land.

19. The decision of this case, on the former hearing, is consistent with the character of plaintiff's title, and the rights of the parties, as defined by the Mexican laws, from which they were derived, and as recognized by the laws of the United States, and of this State, under which they are to be enjoyed, and by which they are to be protected and enforced.

*Elisha Cook,* also, for Appellant, argued the case orally.

*Heydenfeldt* and *Baldwin,* for Respondent.

1. The ownership of mines claimed by government appertains to sovereignty, prerogative, or eminent domain. (Rockwell, Preface, 23, 49, 55, 112—115, 122, 129, 131, 132, 149, 152; 1 Blac. 249, *et seq.;* Plowden, 336; *Hicks* v. *Bell,* 3 Cal. 219; Bainbridge, 40.)

2. The claim to mines was seized by sovereigns for revenue purposes, contrary to the existing law at the time of seizure. (Rockwell, 23, 124—127, 141, 150, 156, 161, 370, 392, 407; 1 Blac. 240, *et seq.* to 295.)

3. United States have no local sovereignty; no prerogative rights; no eminent domain; no rights of revenue, except those granted by the Constitution. (*New Orleans* v. *United States,* 10 Pet. 735, 736; *Pollard* v. *Hagan,* 3 How. 220, 223, 225, 229; 1 McLean, 347; U. S. Const.; Smith's Com. Sec. 180, *et seq.*; Opinion of Com'r Hall.)

4. If the United States had title, it is divested by her patent. Every grant is taken most strongly against the grantor, except the sovereign. The United States is but an individual proprietor. (Bainbridge on Mines, 11 ——; *Hicks* v. *Bell,* 3 Cal. 219; 18 How. 40; *Act to Settle Private Land Claims,* etc. Secs. 13, 15; Wood's Dig. 753; 2 Blac. Com. 19, and Note; *Bourne* v. *Taylor,* 10 East, 205.)

5. The Mexican system did not divest title—required discovery, denouncement, trial, and indemnity. (Rockwell, 115, 127, 38, 50, 51, 53, 162—164, 166—170, 377, 384; *United States* v. *Fremont,* 17 How. 565.)

6. The Mexican law was political—passed away with the conquest; that system is contrary to the policy of our government; there was at its expiration no sovereign to take; the prerogative was abolished; the subject of it followed the *lex natural.* (*United States* v. *Fremont,* 17 How. 564; *People* v. *Folsom,* 5 Cal. 373; 1 Pet. 543.)

7. State licenses cannot be implied to enter upon private property. (*Lyddal* v. *Weston,* 2 Atkyns, 19; *Stokes* v. *Barrett,* 5 Cal. 36; *Tartar* v. *Sp. C. W. & M. Co.* Id. 396.)

8. Apart from the claims of the Crown, the property in minerals is *prima facie* in the owner of the fee. (Collyer on Mines, 2, 3; 2 Blac. 18.)

9. A deed is equally necessary to the conveyance of a right to dig for minerals. (Bainbridge, 74—86; 2 Blac. 121; *Brewer* v. *Hill,* 2 Aust. 413; *Hewlins* v. *Shippan,* 5 B. & C. 229; *Wood* v. *Leadbitter,* 13 M. & W. 838; *Perry* v. *Fitzhow,* 8 Q. B. 757; *Bryan* v. *Whistler,* 8 B. & C. 288; *Cocker* v. *Cooper,* 1 C. M. & R. 418; *Wallis* v. *Harrison,* 4 M. & W. 538.)

*D. W. Perley,* also, for Respondent.

I. The United States, in the various acquisitions she has made of territory, from the old States, and from foreign governments, has never claimed either as sovereign, or as proprietor, any right to the mines within the limits of a private grant.

In support of this proposition, I quote from the argument of Mr. Robert J. Walker before the United States Circuit Court of the District of Columbia, in *Walker* v. *Eldridge:* "Now, what has been the uniform policy of the United States, with regard to mines on the lands of individuals embraced in territories ceded to the United States by some one of our own States, or by foreign governments?

These cessions were mainly as follows:

1. By New York to the United States, in 1781.

2. By Virginia, of the Northwest Territory, in 1784, embracing all the present States of Indiana, Illinois, Michigan, Wis-

consin, and also Ohio, except the western Connecticut reserve in that State.

3. Cession by Massachusetts, in 1785.

4. The western reserve of Ohio, ceded by the State of Connecticut to the United States, in 1786. This cession, embracing nearly one-fourth of the State of Ohio, included, not only all the territory, but all the jurisdictional claims of the State of Connecticut within the limits of that reserve.

Now, in all these five great States formed out of the northwestern territory, neither whilst States or territories, did the United States ever claim any mine on any tract of land which had become private property preceding the cession, whether by a prior French or British grant, or by grants made by Virginia or Connecticut; yet, in all these cases of cession, (unlike the Mexican treaty,) there was a transfer to the United States, not only of the public domain, but of jurisdiction, also; yet, these States contained most valuable mines of coal, iron, copper, lead, and other minerals. In many of these cases, these mines were upon private grants, where the previous government, or sovereignty, reserved rights over mines quite as stringent as those of Mexico.

5. Cession by South Carolina to the United States, in 1787.

6. Cession by North Carolina, in 1789.

This was a cession of soil, sovereignty, and jurisdiction; it included the whole of the present State of Tennessee, over whose public domain Congress exercised its disposing power for many years. By the cession, all previous valid grants to individuals were confirmed. Some of these grants emanated from Great Britain, and some from the State of North Carolina.

Many of these previous private grants included mines of coal, iron, copper, and gold; yet, such mines on private grants were never claimed by the United States, but when mines were located on the public domain, of which the United States became a proprietor, in selling these lands which they transferred, as 'public lands,' always so designated in all the Acts of Congress, this government always claimed the right to sell the mines also, not as mines, distinct from the lands, but as included in the term, 'public lands.'

In no instance has Congress ever claimed any mine on any private grant, nor on public lands by any separate title to the

mines, but only as proprietor of the lands, as public lands, and as well in regard to public as private lands, the mining laws of the ceding country have never been supposed to apply.

7. Cession by Georgia to the United States, in 1802.

This cession, including a transfer of soil and jurisdiction, embraced the whole area included within the present States of Alabama and Mississippi, north of the 31st parallel.

This cession confirmed previous Georgia titles, as also many grants conveying millions of acres, which had emanated from the government of Spain, as also from the British Government of West Florida.

These lands included in some of the confirmed grants, contained valuable mines of coal, iron, and gold, but still no claim to such mines on private grants was ever made by the United States, nor was any relinquishment of them deemed necessary.

Yet, wherein could the right to mines embraced within such British or Spanish grants differ from the right to mines included within the present Mexican grants; these grants were confirmed by Boards of Commissioners created by Congress, or when perfected by the cession from Georgia, recognized by the Board of Commissioners; yet Congress never claimed the right to any such mines included in such grants, perfect or imperfect.

8. Treaty of 1803, ceding Louisiana to the United States.

This was professedly a concession of soil and sovereignty; as to the rights of property the grantees were similar to those in the Mexican treaty. Under the Louisiana treaty, many millions of acres covered by Spanish grants were held to be confirmed by Boards of Commissioners, or by the treaty itself, or by the laws of nations.

These Spanish grants, thus confirmed or recognized, included most valuable mines of coal, iron, copper, and lead, located in Louisiana proper, Arkansas, Missouri, Iowa, and Minnesota, yet the United States, during a period of more than half a century, have never pretended to claim any mine on the grant of an individual. Yet these Spanish grants, so far as mines are concerned, rested on the same reserved rights to the mines in the government of Spain, as is now claimed in regard to mines to have been vested in the government of Mexico.

9. The treaty of 1819, by which the United States acquired Florida and Oregon from Spain.

Some of these lands held under former Spanish grants, contained mines of coal, iron, copper, and gold; yet it never occurred to Mr. Adams, who negotiated the treaty, nor to President Monroe, nor to Secretary Crawford, nor to the American Government, that Congress, as successor to the eminent domain, could claim any of these mines on private grants.

This discovery, as an original suggestion, was reserved for Mr. Ewing, the Secretary of the Interior, in 1849; but it received no response from Congress, nor was ever renewed by Mr. Ewing or any of his successors. It never was applied to California, as it never had been applied under any preceding cession during a period of three-fourths of a century. This right to mines on private grants could never be claimed except by Congress, and no such claim having been made in regard to such mines in California, although their attention was especially called to the subject, any such claim, if it ever could have been made, must be regarded as abandoned, especially in regard to perfect Mexican grants, which required no confirmation from any Board of Commissioners.

And is it not strange, if the new doctrine had any foundation in fact, that it never occurred to the first great Secretary of the Treasury, Alexander Hamilton? Our land system was organized by this great man, under the Constitution. Our public domain, received by cessions from Massachusetts, New York, Connecticut, South Carolina, Virginia, and North Carolina, embraced an area larger than all the original Atlantic States. It was known to be rich in a great variety of mines. It was covered by State grants, by British grants, and by French and Canadian grants; yet in putting into operation our land system, it never occurred to Mr. Hamilton, nor to President Washington, nor to Congress, to claim mines on the lands of individuals; yet that was a period when our wealth and numbers were small, when we were assuming the State debts incurred in the war of the Revolution, and when a resort to every practicable source of revenue was required to sustain the public credit and maintain the government; yet it never occurred to the men of the revolution to commit this spoliation upon private rights, by claiming under some regal or sovereign prerogative, or right of eminent domain, the mines on the lands of individuals."

II.   By the civil law, mines within the boundary of a private grant, originally belonged to the owner of the land; afterwards, the mines were seized upon under various pretenses by the sovereigns of Spain, and claimed as royal prerogatives, and Mexico, adopting the despotic ordinances of the Spanish Kings, claimed the right to mines in the same manner, as part of her *jura regalia, alto dominio,* or right of eminent domain. (Rockwell on Mines, 114, 115, 124, 126.)

III.   All these prerogative laws of Spain, Mexico, etc. in regard to mines, being inconsistent with the public policy of the United States and with the rights of its citizens, were annulled by the conquest.   The civil law became necessarily revived, and the ownership of the mines followed the grant. (Ordinanzas de Mineria, 1783, Tit. 1, Arts. 1, 2, 9; Rockwell, 112; Escriche Diccionario, Vol. 2, Minas, 593; Decree of 1805; Escriche, Tit. 2, 596; Law of April 11th, 1849; Zamora Legislacion, Ultramarina, Suplt. Vol. 6, p. 183; Tit. 6, Art. 14, Ordinanzas de Mineria; Rockwell, 53; Ordinanzas de tierras y aguas, Ed. 1851, p. 31.)

IV.   On the acquisition of California, the United States took the public land as proprietor, and not as sovereign.   All the mines of gold and silver on the public lands, became the property of the government, and passed, not as mines, separate and distinct from the land, but as public land, and all mines on private grants passed to the owners of the grants.

V.   The State of California, on her admission into the Union, did not, and could not, acquire any of the sovereign prerogatives of Spain or Mexico, in mines, either on public lands or on private grants; neither was she capable of acquiring any of the royal prerogatives of the King of England at common law.

California having acquired her pretended sovereign right through the United States, could not take any greater right than the United States had capacity to take and hold for her in trust.   The mines, or rather the power to grant mines, was a "royalty," a seignorage of the King of Spain and among the regalia, a right appertaining to the eminent domain.   The United States could neither claim nor exercise any such authority, and the case of *Pollard's Lessee* v. *Hagan,* (3 How.) must be overruled before any such right can be successfully maintained.

The Federal Government could not add to its powers by treaty or compact; it could not acquire or exercise any of the royal prerogatives of Spain or Mexico in mines or the granting of mines on private property, and it follows that any sovereign right of the State of California, deduced through this source, must inevitably fail, for if the United States could not acquire it, it is too clear for controversy that they could not hold it in trust for the State of California, or for any other purpose whatever.

Can the State of California exercise any of the royal prerogatives of the King of England at common law? Can she claim the mines of precious metals by virtue of any authority derived from this source? I maintain that she cannot, and that the common law has no bearing or influence whatever on this subject. The whole sovereignty of the State of California is vested in the people, and all the powers of the government are derived from the Constitution, which is the fundamental law. All power not granted, is withheld. The common law was not adopted as a part of the Constitution; it was made "the rule of decision," by a legislative Act, passed April 13, 1850, so far as it was not repugnant to, or inconsistent with, the Constitution of the United States, or the Constitution or laws of the State of California.

The territory of California was never under the jurisdiction of England. English law was never extended over it until the passage of the Act of 1850; and then, only as a "rule of decision" in civil or criminal cases, and not as the foundation of any political or governmental powers.

This territory was a province of Mexico, and was governed by the civil and Mexican laws at the time of the conquest. The United States, on acquiring the territory, did not introduce the common law, for neither their government nor their Courts have any common law jurisdiction. The State cannot derive any common law authority from, or through, the United States. She must rely upon her own legislative act, and the question then arises: Can the government of a State acquire, by mere legislative act, any of the attributes of royalty, or any political or sovereign prerogatives? If it can, it might assume royal and kingly powers, and overthrow the Constitution altogether. For the prerogatives of the King, see 7 Coke, 16; 11 Id. 88; Hale's Hist. P.

C. 192; Carter, 90. The same prerogative of the King which gave him the precious metals, also gave him the mines of copper, tin, iron, and lead, wherever they were found intermixed with the royal metals.

In the opinion delivered in this case, Mr. Justice Burnett, in considering the reserved rights of Mexico to the mineral in private property, says: "This right of Mexico was a public right—a right of property in the nation."

I think that no authority can be found in support of this last proposition, and that all authority contradicts it. If the doctrine could be sustained, the clear and unavoidable result would be, as I shall show hereafter, to yield up to the grantee all the gold in his grant. The argument and deduction is this:

The right of Mexico in the mineral, says Judge Burnett, was not a right of sovereignty; therefore, it did not pass to the State of California on her admission into the Union. It was a right of property in the nation, and as such, passed to the United States, but as the United States did not, on the admission of California into the Union, reserve anything but the "public lands," her right must have passed to the grantee; but, if this is not so, her right of property unquestionably passed to the grantee, on the issuing of the patent, conveying all her right, title, and interest, to the land, without reservation. The rights of Mexico in the mineral, both on the public lands and on private grants, were not mere rights of property, but were political and sovereign rights, and the United States did not succeed to these rights of sovereignty, as they were annulled by the conquest.

The case of *Hicks* v. *Bell*, (3 Cal.) ought to be overruled, as far as it has any bearing on the case before the Court, for the following reasons:

1. Because there was no question before the Court as to the right of the State of California to the gold on private grants. It was a contest between the parties as to the right to a mining claim on the public land of the United States. The learned Judge who delivered that opinion, says: "The gold and silver on the public lands are as much the property of the State, by virtue of her sovereignty, as are similar mines on the lands of private citizens."

Now, the case before the Court did not call for an opinion on

that point. It was not the question argued, or upon which the Court had a right to pronounce a judgment.

2. Because it is not only wholly unsustained by any authority, but is absolutely suicidal in its reasoning.

The learned Judge further says, in his opinion: "That the several States of the Union are entitled to the *jura regalia,* which pertained to the King at common law."

The proposition is fallacious. The States not only have none of the prerogatives of the King of England at common law, but they are totally destitute of all the higher attributes of sovereignty. The great powers of war and negotiation, of regulating commerce with foreign nations and among the several States, of coining money, of fixing the standard of weights and measures, of establishing rules of naturalization, of establishing post-offices and post-roads, of granting letters of marque and reprisal, and patents for useful inventions, of punishing piracies on the high seas and offenses against the law of nations, are not possessed by the States.

They can enter into no alliance or confederation, they cannot coin money, emit bills of credit, pass any bill of attainder, or make any law impairing the obligation of contracts; in fact, the States possess scarcely any sovereign powers whatever, and the idea put forth by the learned Judge in the above extract from his opinion, that the States possessed all the *jura regalia* of the King of England, has no foundation.

The King claimed the royal metals: 1st, because they were the most excellent of things, and he was the most excellent of persons; 2d, because the treasure was necessary to support his fleets and armies; and, 3d, as an incident to his prerogative of coinage. None of these reasons have the slightest applicability to State sovereignty, for the State can neither maintain fleets nor armies, nor coin money.

It is said, in the opinion, that "it is immaterial as to the reason for the origin of the law." But Lord Coke says: "The reason of the law is the life of the law, and when the reason of any particular law ceases, so does the law itself." (7 Coke, 69.) The maxim containing this principle is as old as the common law If—*cessante ratione legis, cessat ipsa lex.*

VI. By the Act of Congress, approved September 9th, 1850,

admitting California into the Union, she was admitted on the express condition that she should do no act whereby the title of the United States to the public lands should be impaired or questioned, and by yielding up all right in the public lands, she thereby relinquished all right to the mines on those lands, and every right of property appendant or appurtenant thereto, and the title of the United States has been distinctly recognized in all subsequent legislation.

The terms "public lands," have been construed for more than half a century, both by the States and by the Federal Government, in all the ordinances admitting new States into the Union, as including mines as part of the lands, and thus holding the mines on the lands by the same title as a proprietor.

But the State of California has not only relinquished all right to the gold mines by the ordinance admitting her into the Union, she has also acknowledged the title of the United States to all the mines within her limits by direct legislation. (Act 13th April, 1850, Secs. 6, 14.)

The power of Congress to dispose of the mines on the public lands, by virtue of its right of primary disposal of the lands, is fully admitted, but this gives Congress no right to dispose of private lands, nor to regulate the use that shall be made of such lands, nor the products thereof. It has, in fact, been denied by high authority, that Congress could legitimately make any disposal of the mines on the public lands separate and distinct from the lands; much less could it make any disposal of the mines on the lands of an individual, which never became public lands.

No such power is granted by the Constitution, nor can it fairly be deduced from the power to dispose of the public lands.

If the lands were never public lands, the power of Congress never could attach to them in any matter whatever; neither can Congress prohibit the owners from using the mines on their own lands, in any manner they may think proper.

The right of the United States in the public lands was distinctly admitted by the State of California in Art. 9th of her Constitution.

Also, by the Act of 1850, prescribing the mode of maintaining and defending possessory actions on the public lands of the United States, and in all subsequent amendments to that Act.

Also, by the Act of May, 1852, authorizing the location of school land warrants on the five hundred thousand acres of land granted to the new States by the Act of Congress of September 4th, 1841.

Also, by the Act of April 30th, 1857, authorizing the location and patenting of school lands.

Also, by the Act of April 28th, 1855, to provide for the sale of the swamp and overflowed lands.

By all these Acts, and by the Constitution, the right of the United States in the public lands is clear and unquestionable. And it is equally clear that the right to the soil carries with it the right to the mines, and that this right was never questioned before by any of the new States.

VII. The State of California has never authorized, by her legislation, any right to mine except on the public lands; and, if she had, by express enactment, authorized an invasion of a private grant for mining purposes, such act would be unconstitutional and void. (*Stokes* v. *Barrett*, 5 Cal. 39; *Tartar* v. *S. C. Water Co.* Id. 399; *Burdge* v. *Underwood*, 6 Id. 46; *Fitzgerald* v. *Urton*, 5 Id. 309.)

The grant is an executed contract, (2 Blac. Com. 359,) and is protected by the treaty, by the law of nations, and the Constitution of the United States, and any State law authorizing a party to enter on a private grant to dig for gold, would be in direct violation of the Constitution, and void for the following reasons: 1st, as a law impairing the obligation of contracts; 2d, as depriving a citizen of property without due process of law; 3d, as taking private property for public use without just compensation; 4th, as repugnant to that clause of the Constitution of the United States declaring treaties the supreme law of the land.

VIII.   If it could be maintained that the United States ever acquired any right in the mines within the limits of the grant to Fremont, it could only have been a proprietary, and not a sovereign, right, and by issuing the patent without any reservation, such right would clearly pass to the patentee.

Upon a superficial investigation of this matter, it may seem to make no difference in what capacity the United States became entitled to the gold on the public lands; but, it is really

a question of the greatest importance, especially when considered in connection with the views advanced by the Appellant's counsel in this case, for if it could be maintained, that the right of the United States in the gold was a mere right of sovereignty, the inevitable result would be, that such sovereignty, on the coming in of California, would pass to her, because the United States have no constitutional capacity to exercise municipal sovereignty, or eminent domain, within the limits of a State. (3 How. 223.)

The question is also important in two other respects :

1. If this was a right of sovereignty in Mexico, then the gold on a private grant never could have passed as property to the United States.

2. If, however, the gold on a private grant was a right of property in Mexico, and as such passed to the United States, the question arises, as to the effect of a patent as between the government and the patentee.

It only remains to consider, under this proposition, the force and effect of a patent, without reservation of the mineral.

A patent is a record of the highest character.  It imports absolute verity.  It is the superior and conclusive evidence of legal title.  It cannot be assailed collaterally, either at law or in equity.  Nothing passes a perfect title to public lands, with the exception of a few cases, but a patent. (*Wilcox* v. *Jackson*, 13 Pet. 498.)  The whole legislation of the government of the United States in reference to public lands, declares the patent to be conclusive evidence of legal title. (*Bagnell* v. *Broderick*, 13 Pet. 436.)

Even if a patent is obtained from the government by fraud, a stranger or third party cannot set it up, for it is a question exclusively between the government and the grantee.

Such being the nature and effect of a patent, the precise point to be determined, is this :

Will a patent, where there is no exception of the minerals, convey mines of gold and silver on the land to the patentee ?

This question was passed upon by Mr. Justice Clayton, in the case of the *State of Georgia* v. *Canatoo*, (a Cherokee Indian,) reported in the *National Intelligencer* of October 24th, 1843, and cited in 3 Kent's Com. 378.

This case appears fully to sustain my proposition, but it cannot be doubted, that on general principles, a patent from the United States, would not only convey the land, but everything it contained. There is no common law rule binding upon the United States, making an exception in case of precious metals.

If the land embraced in Fremont's patent had been public land, acquired by the United States from Mexico, and had then been sold to Fremont by the United States, and a patent issued to him for the land, without any mention being made of the mineral, it cannot be questioned that the mineral would have passed with the soil, and as a part of it.

The same result is produced by the issuance of a patent in this case.

It does not, on its face, purport to be a mere relinquishment of such a title as Alvarado had, but it contains present words of grant, conveying to John C. Fremont and his heirs, the land embraced within the patent, without any exception or reservation whatever.

And this is not, in any way, inconsistent with the Act of Congress, of March 3d, 1851. The 15th Section provides, that the patent shall be conclusive between the United States and the claimant.

Conclusive of what? Conclusive that the United States has no right, title, or interest, of any kind, in and to the land embraced within the patent, or to anything the land contains.

When Fremont's case was before the Supreme Court of the United States, it was argued by Mr. Cushing, and the argument is repeated and insisted on, with peculiar force and earnestness, by Mr. Justice Burnett, in his opinion, that Fremont could take no other, nor any greater or better, title than Alvarado had. The language of the Judge is as follows:

" Confirmation can only be matter of evidence; it makes certain, gives new assurance, puts past all doubt.

The decision was only upon the validity of a pre-existing title, and when the title or claim was finally confirmed and the patent issued, the final decree and patent were only conclusive between the United States and the claimant, as to the matters involved, and no more. The claimant presented his petition setting forth his title, and praying for a confirmation of the same. When

confirmed, he had only the title originally granted, with a new assurance of its validity."

The doctrine thus laid down cannot, as I respectfully insist, be maintained. The confirmation and patent to Fremont conveyed to him a different title altogether from that possessed by Alvarado, and this is obviously a correct logical deduction from the opinion of the Supreme Court of the United States, in 17 Howard. The grant to Alvarado contained conditions of a most stringent character; he was prohibited, on the face of the grant, from either selling the land or mortgaging it; he was required to build a house on it, and make a settlement, within a year. The penalty of forfeiture was attached to any breach of the conditions, and, by the Mexican law in force at the time the grant was made, no foreigner could acquire or hold any real property in the Republic, and any transfer to a foreigner was absolutely void. The Mexican law of denouncement was also in force and attached to the grant in the hands of Alvarado.

Every one of the conditions of this grant were broken by Alvarado—none of the conditions were complied with. By the Mexican law, a right of forfeiture had accrued to the government, and it was clear, that if the country had been regained by Mexico, she could have enforced the forfeiture, and it was contended by Mr. Cushing, that this was a public right which passed to the United States, and that they could now enforce the forfeiture; but the Court confirmed the grant, and the patent was issued without any reservation of the mineral.

Fremont then took the grant, free from all the conditions which attached to it in the hands of Alvarado; in this respect he took a different title from that of Alvarado; but there is another great and important distinction between the title of Alvarado and that conveyed to Fremont by the patent. In the hands of Alvarado, the gold mines in the lands covered by the grant, were subject to the Mexican laws of denouncement, but whoever asserted or claimed that these laws remained in force after California was acquired by the United States? The counsel of Appellant do not assert it; it is not asserted by Judge Burnett. These were political laws, and were annulled and abrogated by the conquest.

IX. The right of Col. Fremont to the ten square leagues of land

embraced within his patent, is a right protected by the treaty, by the law of nations, and the Constitution of the United States; and if, under the pretense of digging for gold, he can be divested of the possession of a single square foot within the area of his patent, he may on the same principle be divested of his entire grant.

The 8th and 9th Articles of the treaty provide that property of every kind in the territory, shall be "inviolably respected," and that all Mexicans then domiciled in California or elsewhere, their heirs and vendees, shall be maintained and protected in the free enjoyment of their liberty and property.

"The term 'property,' as applied to lands, comprehends every species of title, inchoate or complete. It is supposed to embrace those rights which lie in contract; those which are executory as well as those which are executed." (*Soulard* v. *United States*, 4 Pet. 511.)

A treaty is the "supreme law of the land."

In this case the treaty is an executed contract, and a rule for the Court.

"Whenever a right grows out of, or is protected by, a treaty, it prevails against all laws or decisions of the Courts of the States, and whoever has a right under the treaty is protected." *Ware* v. *Hilton*, 3 Dall, 199.

"A treaty is paramount to the provisions of the Constitution or the laws of a State." (*Gordon* v. *Kerr et als.* 1 Wash. C. C. 322; *United States* v. *Percheman*, 7 Pet. 51.)

*S. W. Inge*, for Appellant, in reply.

Upon the cession of California, all public rights of property were transferred to the United States, and all private rights of property remained inviolable, both by the laws of nations and the treaty, in the private owner. No rights of property pertaining to the Mexican Government in the ceded territory were annulled by the cession; all such passed to the new sovereign; the right of the Mexican Government to the mines, in public as well as private land, passed, of course, with all other public rights to the United States. There is certainly no want of capacity in the Federal Government to own gold mines in the territories; such ownership is not inconsistent with the public

policy of the United States, or the rights of its citizens, and is a necessary result of the transfer of the sovereignty and jurisdiction of the country by Mexico. In the *Fremont Case*, (17 How. 565,) the Court say : " the right which the Mexican Government reserved to control this survey, passed with all other public rights to the United States." The ownership of the mines was as much a public right of the government of Mexico, as the right " to control this survey."

Upon no hypothesis can Fremont claim title to them now. If they passed to the State upon her admission, he can show no right under the State ; if they did not pass, but continued the property of the Federal Government, notwithstanding the admission of the State, he can show no right under the Federal Government. He is entitled to nothing, except what was confirmed to him by the Supreme Court ; all his rights are founded thereupon, and none not embraced in the decree were conveyed to him by the patent ; and the Court in the *Fremont Case,* (17 How.) say mines are not within its jurisdiction ; that under the Act of 1851 it could only confirm his title to the land. This is a conclusive answer to his claim of the minerals.

Whether the United States acquired the mines mixed or separately, it is certain that they commenced to treat them as interests separate and distinct from the land. In their first Act in relation to California, the distinction is broadly made, and has been since preserved throughout all subsequent legislation. The Act for the admission of California, contains certain provisions which prominently show this distinction. The debates upon that Act also prove that the public lands and mines were considered as separate interests, which it was not the policy of the government to confound. And more than all, the Supreme Court, in confirming Fremont's claim to land, recognize and establish the distinction.

The same distinction may be seen in the debates of the California Convention. All the laws, written or unwritten, of Mexico, upon this subject, sanction and enforce the distinction, affording careful protection to the separate rights of the miner and the proprietor of the land or soil.

The position that California has never authorized by her Legislature any right to mine, except on the public lands,

evinces a singular misapprehension in regard to the legislation of the State. California has never made a discrimination in her legislation between the mines in public and private land. Upon certain conditions, she has authorized foreigners to work the mines in this State, from which the inference is clear, that American citizens were permitted to work them without conditions: that is to say, without paying the tribute which was exacted from foreign miners. All the right of the State in the mines has been conferred, with or without conditions, upon the public, and no distinction has ever been made between mines upon public and private land. The license of the State to the public is coextensive with the right of the State, and if the State owns the mines upon private land, the right of the public to work them is as indisputable, as the right to work the mines on public land.

The mines did not pass by the patent to the patentee.

1. The United States did not own the mines, when the patent was issued, and therefore could not convey what she did not own.

2. If the ownership continued in her after California became a State, it remains in her now, Congress never having disposed of it to Fremont.

Section 3, of Article 4, of the Federal Constitution, prescribes as follows:

" The Congress shall have power to dispose of, and make all needful rules and regulations, respecting the territory or other property belonging to the United States."

The grant of this power to Congress is exclusive. No property of the United States can be disposed of except by the authority of an Act of Congress.

At the October Term, 1859, the cause was again argued by *S. W. Inge* and *Elisha Cook*, for Appellant.

*Hydenfeldt* and *Botts*, for Respondent.

The argument of Inge only, was reported, and is substantially as follows:

The record in this case presents three points:

1. Fraud in the survey of Fremont's grant, and the procurement of his patent.

2. Estoppel.

3. The mineral question.

The opposing counsel concur in asserting that we are mere naked trespassers, without title or color of title, who have intruded upon the property of Fremont.    They say that a trespasser who intrudes upon the land of another cannot defend himself by saying that the title of the true owner is fraudulent, nor can he say that the true owner is estopped by declarations made years ago prejudicial to his own title.

We have never intruded upon Fremont's land.    Our mining location was made when the land was vacant and unclaimed by Fremont or any other person, under the encouragement of both the Federal and State legislation.    At the time, and for years before, and after, Fremont, in the most solemn manner, asserted his claim to a tract of land many miles remote from our location, and that his grant could never interfere with our claim and possessions.    All of Fremont's rights to any particular and defined tract of land, are derived and date from his survey in 1855, four years subsequent to our mining location.    Our title is as good against Fremont and all the world, as any other mineral title, and we have the same standing in a Court of Justice, to raise any and all questions in our defense which may be conceded to any other owner of a mining claim.

A title to property may exist unevidenced by a patent.    The government may make a direct legislative grant of its public property, land, or minerals, which would be final, conclusive, and perfect, without a patent.    A patent is one form of conveyance; any other may be adopted by the government with the same effect.    A patent evidences the will and intention of government to grant, and from that it derives its potency.    Under the legislation of the two governments, the miner has a title to his claim, as perfect and irrevocable, as the patentee to his land.    The miner's title dates from his location and appropriation to himself, under the laws, of that which was before open and common to all, and endures so long as he may continue his possession.    It can only terminate by his own will, evidenced by an abandonment of his possession.    Our title dates from our location and appropriation in 1851, and was a subsisting, perfect, title, when the survey of Fremont was thrown over us in 1855.    Instead of

our being trespassers upon his land, he is the trespasser upon our mining claims.

Having shown that we occupy a standing in Court to raise the question of fraud and estoppel, I proceed to inquire whether we have established those defenses.    What does the record show in support of the allegations of fraud against Fremont's title ?

It shows that all the principles prescribed in the opinion of the Court, confirming his grant, relative to the mode and manner of the survey afterwards to be made, were violated; that the survey was made clandestinely, the officers making the same, being ashamed or afraid to avow their object; that the survey was made under the influence and at the dictation and according to the direction of Fremont; that in making the same the tract originally claimed by him of grazing land in the valley of the Mariposa River, many miles distant from our location, was abandoned; and his quantity of ten square leagues carved out of the rugged and barren mountains by running irregular, eccentric, zig-zag, lines, in such a manner as to include the richest veins of minerals in the State, and to cover our prior mining location ; that after having thus procured his survey, the same was transmitted to the authorities at Washington, to whom Fremont represented that the land embraced in the survey was the same confirmed to him by the Court, and which he had always claimed, and that it embraced exclusively grazing land, not mineral, and that the officers of the government being deceived by the misrepresentations, caused the patent to be issued.    This in substance constitutes the fraud practiced in the execution of the survey, and in the procurement of the patent.    I admit that a patent procured from the Federal Government, without either mistake or fraud, is conclusive, as a general rule, of all it purports to convey, viz: the title of the government to the public lands, not minerals; but the decisions of the Federal Courts abundantly show that prior equities will be protected against a patent procured by fraud; that, indeed, any good title will be protected against such a patent.    (*Gaines* v. *Nicholson et als.* 9 How. 364; *Bagnell et als.* v. *Broderick*, 13 Pet. 450.)

I proceed to the consideration of the estoppel pleaded by us in bar of the action.    What does the record show in support of this plea ?    That in 1847, Fremont derived, by assignment from

Alvarado, a grant to a certain tract of land in the valley of Las Mariposas, of ten square leagues in extent; that in the year 1849, he caused a survey and location of his grant to be made by one Von Schmidt, the map whereof was afterward attached to his petition to the Board of Land Commissioners, in which he averred that the identical tract of land described in the said map of Von Schmidt, was the land claimed and owned by him, under the assignment to him from Alvarado. This is record declaration number one, by Fremont, that the land claimed and owned by him, was grazing land, in the valley of Las Mariposas, and did not reach within many miles the mines, subsequently located and appropriated by us, in the year 1851, as the map of Von Schmidt embraced land of that character, and stopped short of us by many miles. In 1852, when Fremont's claim was pending before the Board of Land Commissioners, an order was made by the Board, directing another survey of his claim, which was immediately thereafter carried into execution by the United States Surveyor-General, which survey conformed to the previous one of Von Schmidt, and embraced the grazing lands of Las Mariposas' Valley, and did not reach within many miles of our location. This is record declaration number two, to the same effect. One was made before, and the other after, our location. Upon these maps Fremont's claim was based before the Land Commission; upon these maps his case was argued and submitted; and upon these maps the identical land described therein was afterwards confirmed to him by the Board of Land Commissioners. The decree of confirmation was acquiesced in and accepted by him, and under and by virtue of this decree he continued to claim and hold this land up to the year 1855, when he abandoned his original and proper location, and procured the survey upon which his patent is founded.

Upon this record I might safely rest, but it appears from the affidavit of Shaw & Clark, that Fremont's attention was called to our location before we commenced the expenditure of money; that he then disclaimed all claim of title thereto, and declared that his land was that described in the map of Von Schmidt, and that his claim could, therefore, never interfere with us. It appears that constantly afterwards, up to the date of the survey in 1855, he continued to disclaim title to our location, and thus

encouraged us to go on in our expenditures. (*Welland Canal Co.* v. *Hathaway*, 8 Wend. 480; 19 Id. 557; Cowen & Hill's Notes, Part 1, Note 225.)

As to our right to the minerals. The grant to Alvarado, which is the origin of Fremont's rights, was a land grant under the Mexican colonization law of 1824. It is admitted on the other side, that the Governor had no power to concede any right to the minerals, and, therefore, the grant to Alvarado can embrace no such right. Alvarado could convey to Fremont no more than the grant of Micheltorena had conveyed to him, and the grant contained no mineral rights. Upon our acquisition of the country, Fremont held no more under his assignment than the right to a certain unknown quantity of land, to be afterwards located within certain exterior boundaries mentioned in the grant, and subject to this right of location, all the territory mentioned within those boundaries, passed to the United States. He had what is familiarly known in the law books, as a "floating claim," to a certain quantity of public land; in other words, a mere right of location. His rights were not enlarged by our acquisition of the country. At the date of the treaty, the mines belonged to the Mexican nation. What became of them afterwards? In the language of the Chief Justice of the Supreme Court, confirming this claim, all the public rights of Mexico passed by the treaty to the United States. Among those rights is included the ownership of the mines, to which the United States acquired the same ownership and control possessed by the former sovereign. In what character did she acquire those rights? As proprietor simply, or as sovereign? The 5th Article of the treaty answers that question. That article embraces all the rights ceded, or to speak more correctly, by operation of that article we derive all our rights, for no property of any class is mentioned *eo nomine*. It extends our boundary lines to the southward and westward, so as to include the former Mexican territories of New Mexico and California, and spreads our sovereignty and jurisdiction over those territories.

It is simply an extension of our sovereignty and jurisdiction, and contains no cession of property. Therefore, the rights which we derive are necessarily incidental to sovereignty, and were afterwards held as they were originally received in our

character as sovereign.  Thus the right of Mexico to the mines in California passed by the 5th Article of the treaty to the United States, as incidents to the rights of eminent domain, and municipal jurisdiction over the ceded territory.  Upon the admission of California into the Union the rights held in trust by the Federal Government for the embryo State vested in her, as it is well settled that the Federal Government cannot hold or exercise rights of eminent domain, or municipal jurisdiction within the limits of a State, except in the single case mentioned in the 8th Section of the 1st Article of the Constitution.  The principles of constitutional law applicable to this subject, have been clearly and ably expounded in the case of *Pollard's Lessee* v. *Hagan*, and the subsequent one of *Goodtitle* v. *Kibbe*.

In the Act of the Legislature, passed April 20, 1852, relative to the mines, there is a clear assumption of State ownership. It provides that the precious metals found within the possession of persons occupying public land for grazing or agriculture, shall be open to the public.  The next Act, passed by the succeeding Legislature on the 22d January, 1853, goes still further, and contains a clear and distinct declaration of State ownership; imposes a tax upon mining claims, and provides, that in default of its payment the Sheriff shall sell the claim and execute a deed to the purchaser, conveying to him the title of the State.  Subsequently, at every succeeding session of the Legislature, Acts have been adopted taxing foreign miners, and otherwise exercising acts of ownership over mining property and mining interests, which are emphatic declarations of State ownership.

There are but two parties who can pretend to have any interest, either as sovereign or proprietor, in the mines: the State of California and the Federal Government.  The first has always claimed and exercised ownership over them—the latter has abandoned them.  When the clause in the Act admitting California into the Union, which provides that she should do no act whereby the title of the United States to the public lands should be impaired or questioned, was under consideration, it was contended by the ablest lawyers in the American Senate, that unless the mines were also embraced they would be forever lost to the Federal Government.  They contended, justly and earnestly, that the term "land," neither, under the common or civil law,

included mines, which were the property of the sovereign; (see 1 Cruise's Dig. 38, Title 1, Estates and Fee Simple, Sec. 2); that mines were an exception, and, perhaps, the only one, and for that reason more prominent, to the maxim of the common law, *cujus est solus ejus est usque ad cœlum.*

I am therefore justified in saying, that California was admitted with a full knowledge that by and under the Act of admission, all the mines of gold and silver vested in the new sovereign. California is bound by the Act of admission "never to lay any tax or assessment, of any description whatsoever, upon the public domain of the United States."

But she has taxed mining claims. Has the government of the United States ever objected to her exercise of that power? No objection is made to her exercising every act of ownership over the mines; and why? Because she is the owner, and the United States admits her ownership.

The various Acts of the Legislature, before referred to, and the decisions of this Court, have been known to the Federal Government for years, and yet no step has been taken on their part to assert a counter-claim to the mines.

Is not this long acquiescence in our claim of ownership to the mines conclusive upon the United States? Conceding for argument that the mines did not pass to the State of California on her admission into the Union, where is the ownership now?

How does Fremont derive title from the United States? It has been the established law of England for centuries, that a grant by the crown does not convey the ores of gold and silver unless they are expressly named. The same rule applies to our government, State and Federal.

Are the mines expressly named in the patent to Fremont? The application of this principle would settle the question, but I take higher ground, and contend that if they had been expressly named in the patent, he would be as destitute of right as he is now. No principle is better settled, than that no right of property can be derived from the Federal Government, except by the direct exercise of the legislative power of Congress. (Sec. 3, Art. 4, of the Federal Constitution.)

It is not claimed or pretended that Congress ever passed but one Act on this subject, the Act of 3d March, 1851.

That Act has been judicially determined by the Supreme Court of the United States, and it has been held that it does not touch the mines.

FIELD, C. J. delivered the opinion of the Court—COPE, J. concurring.

In 1844, Micheltorena, then Governor of California, issued to Juan B. Alvarado a grant of a tract of land, known as "Las Mariposas," to the extent of ten square leagues, lying within designated boundaries embracing a much greater quantity. In 1847, Alvarado conveyed, for a valuable consideration, his interest in the tract to John Charles Fremont. In January, 1852, Fremont presented his claim, under the grant, to the United States Board of Land Commissioners for confirmation, and, in December of the same year, the claim was confirmed. On appeal to the United States District Court, the decision of the Board was reversed; but on appeal to the Supreme Court of the United States, the claim was adjudged to be valid, and the cause was remanded to the District Court for further proceedings. In pursuance of the mandate of the Supreme Court, a final decree of confirmation was entered in June, 1855. In July following, the specific quantity designated in the grant—ten leagues—was surveyed and segregated from the general tract embraced within the exterior boundaries of the grant, under the direction of the Surveyor-General of the United States for California, and the survey was subsequently approved by that officer. Upon this survey and the decree of confirmation, a patent was issued on the part of the United States to Fremont, bearing date on the 19th of February, 1856, signed by the President, and countersigned by the Acting Recorder of the General Land Office at Washington. The patent refers to the proceedings before the Land Commission, the appeals, and the judgments—both of the District and of the Supreme Court, the final decree of confirmation, the survey thereunder, and its approval, and, in terms, grants the land, with the specific description of the approved survey, to Fremont and his heirs and assigns forever. This patent includes the premises occupied by the defendant, and, after its receipt, Fremont leased them to the plaintiff for the period of seven years, at the monthly rent of one thousand dollars.

For their recovery, the lessee brings the present suit. These premises contain ledges of gold-bearing quartz, and the defendant entered into their possession in May, 1851, and between that period and the issuance of the patent to Fremont, erected thereon, at great expense, machinery and mills for excavating and crushing the rock, and extracting the gold, and has continued in the occupation of the premises, working the quartz-veins and extracting the gold, ever since. The lease, in terms, covers these various works, which are, as the complaint alleges, fixed to the soil and a part of the freehold.

To resist a recovery, the defendant relies upon three grounds : 1st, fraud in the survey of the Alvarado grant and the procurement of the patent by Fremont; 2d, estoppel from the declarations and conduct of Fremont, and, 3d, a license from the government to enter upon the premises and extract the gold. It was stipulated between the parties, previous to the trial, that the defendant might have any affirmative relief which it would be entitled to upon filing a cross bill to the action, or an original bill setting up the facts contained in the answer ; and might set up any equitable defense which it would be entitled to set up in a Court of Chancery to the case made in the complaint.

The effect of the first clause of the stipulation we conceive to be this : that if the facts alleged in the answer, and established by the proofs, could, in any proceeding at law or in equity, be urged by the defendant against the prosecution of the present action, they may be urged in this case without regard to the form of the action, or the character of the pleadings. As to the second clause of the stipulation, the parties appear to have construed it to mean that the defendant might, upon the development of the proofs, without reference to the allegations of the answer, interpose any defense which a Court of Equity would sustain to the case set forth in the complaint.

We shall, for the determination of the appeal, follow this construction, liberal as it is, without considering an objection which might be, but is not, taken, that the Court cannot properly, even upon the consent of parties, pass upon questions not raised by the written allegations of the pleadings.

As to the charge of fraud in the survey, and the procurement of the patent, the answer sets forth that the grant to Alvarado,

Biddle Boggs *v.* Merced Mining Co.

which is the basis of the claim of Fremont, was issued upon a petition for agricultural and grazing land, of the extent of ten square leagues, to be located within exterior boundaries embracing over one hundred; that neither in the petition nor in the grant was any particular description given of the specific quantity granted; that no survey or location of this quantity was attempted until 1849, when a survey was made of the ten leagues by Fremont in the valley of the Mariposas, and a map of the same published to the world; that the lines of this map do not approach, within a distance of two miles, the premises in controversy; that this map was annexed to the petition of Fremont presented to the Board of Land Commissioners for the confirmation of his claim, and that by the decree of the Board, the claim was confirmed to the land described in it; that until the decision of the Supreme Court, in December, 1854, Fremont persisted in claiming the land thus designated, and disclaimed ownership in, or title to, the mineral lands in controversy, but that after that decision, and in July, 1855, he "caused and procured" another survey to be made, which includes these lands; that this survey was approved by the Surveyor-General, and that the same was fraudulent in this: that it was made clandestinely, by the agents of Fremont, who carefully concealed from the defendant his intention to include the mineral lands and veins in controversy, knowing that the grant to Avarado, qualified and controlled by the petition of Alvarado, called only for grazing and agricultural lands, and that, under the decision of the Supreme Court, he was entitled to a location upon none other.

The answer contains no other allegations of fraud in the last survey, than this concealment, and the variance from the original survey made in 1849; but, when the cause was called for trial, the defendant filed an affidavit, to the effect that he expected to prove by the Attorney-General of the United States and the Commissioner of the Land Office at Washington, that, in procuring his patent a fraud was perpetrated upon the government by Fremont, in misrepresenting the quality and character of the lands embraced in the survey, and by several other witnesses, that the survey was made and concealed at the time from the defendant and all others claiming adversely to Fremont.

It was, therefore, admitted, for the purpose of preventing a continuance, that the several witnesses named would, if present, respectively testify, as stated in this affidavit, and that their testimony should be considered as actually given on the trial, or as offered and overruled by the Court as improper. The testimony thus assumed, was offered, and, for all the purposes of this case, must be deemed as actually before the Court. That portion which relates to the alleged clandestine survey, was met on the trial by counter proof, and negatived. The Court passed upon the point, and found against the charge; and its finding, in this respect, is fully warranted by the evidence. But even were this not so, we are unable to perceive that it would make any difference. There was no obligation resting either upon Fremont or the Surveyor-General, to give notice of the survey to the defendant, or any one else, and it is of no consequence how secretly or how openly the survey was made. That portion of the charge which relates to the alleged misrepresentation of the quality and character of the land, is conclusively answered by the proceedings in the Supreme Court of the United States, to which reference is made in the record, and in the argument of counsel. The alleged misrepresentation consists in the fact, that the land is mineral, whereas, it is said in argument, (for nothing of the kind appears in proof,) that it was represented to be exclusively grazing and agricultural. The fact that the land contained mines of gold and silver was before the Supreme Court, and constituted one of the grounds upon which the Attorney-General based his argument against the confirmation of the claim. To his objection on this head, the Court said in its opinion: "In relation to that part of the argument which disputes his right, upon the ground, that his grant embraces mines of gold or silver, it is sufficient to say, that under the mining laws of Spain, the discovery of a mine of gold or silver did not destroy the title of the individual to the land granted. The only question before the Court is the validity of the title. And whether there be any mines on this land, and if there be any, what are the rights of the sovereignty in them, are questions which must be decided in another form of proceeding, and are not subjected to the jurisdiction of the Commissioners or the Court, by the Act of 1851." (17 How. 565.) That the land claimed by Fremont was mineral,

or believed to be mineral, was thus well known to the government, as is manifest from the argument of the Attorney-General and the decision of the Court; and in the face of these public acts, the charge of misrepresentation as to its quality and character, falls to the ground. The entire charge of fraud, then, rests upon the simple fact, that the official survey, obtained by Fremont, differs entirely from his own original survey. That this private survey—accompanying his petition to the Land Commissioners—was not binding upon the government, is too clear for argument.

In *Smith* v. *The United States*, (10 Pet. 334,) the Supreme Court says : " The laws of the United States give no authority to an individual to survey his grant or claim to lands; he may mark lines to designate the extent and bounds of his claim, but he can acquire no rights thereby."

In *United States* v. *Hanson*, (10 Pet. 199,) a private survey was considered and rejected, as being of no force or validity. In *Les Bois* v. *Bramell*, (4 How. 449,) in speaking of a survey of one Mackay, the Court said : " It was a private one, made at the instance of the inhabitants of St. Louis, and not binding on any one;" and in *Mackay* v. *Dillon*, (4 How. 421,) of the same survey : " It was in its nature a private survey, not binding upon the United States." In *Glenn* v. *The United States*, (13 How. 256,) in referring to surveys offered in evidence, the Court said : " The surveys produced to us are private ones, and of no value in support of the claim."

It is true, the decree of the Land Commission confirmed the claim of Fremont to the land described in his survey, but that decree was reversed by the District Court, and when the case was remanded to the District Court, from the Supreme Court, it was accompanied with directions to take further proceedings in conformity with the opinion of the latter Court. In that opinion, allusion is made to the form of the survey, which was to follow. " Some difficulty," says the Court, " has been suggested as to the form of the survey. The law directs that a survey shall be made, and a plat returned, of all claims affirmed by the Commissioners. *And as the lines of this land have not been fixed by public authority*, their proper location may be a matter of some difficulty. Under the Mexican Government the survey was to be

made or approved by the officer of the government, and the party was not at liberty to give what form he pleased to the grant. This precaution was necessary, in order to prevent the party from giving it such a form as would be inconvenient to the adjoining public domain, and impair its value. *The right which the Mexican Government reserved to control this survey passed, with all other public rights, to the United States ; and the survey must now be made under the authority of the United States, and in the form and divisions prescribed by law for surveys in California, embracing the entire grant in one tract."*

Upon filing the mandate of the Supreme Court, the District Court, in entering the final decree of confirmation, in June, 1855, conformed to the opinion of that Court, and ordered that the land be surveyed according to its direction. It is upon this decree, and in pursuance of it, that the survey, which is the subject of complaint, was made and approved by the Surveyor-General of the United States for California. No other or previous survey has any standing in Court, or can, in any respect, affect the rights of the grantee. That Fremont "caused and procured" the survey to be made, does not imply the use of any improper influences for that purpose. That he applied to the proper officers to make the survey, is no doubt true ; but, that he employed any means to improperly control their action, there is no evidence, and that the survey was made secretly, or concealed after it was made, is, as we have already observed, contradicted by the testimony.

The grant to Alvarado passed a present and immediate interest to ten square leagues, to be afterward surveyed and laid off within the exterior limits of the general tract by the government. Such survey could only be made under the former government by its officers, and could not be made by the grantee himself. This right of survey passed, with all other public rights, to the government of the United States, upon the cession of the country, and is now to be exercised by its officers, and in conformity with its laws. By the legislation of Congress, the subject of surveys is intrusted to the Executive Department of government, and is not left to the direction or control of the grantee. The action of that department in the location of confirmed grants, when the quantity granted is without specific

boundaries, lying within a larger tract, is conclusive and bind-
ing upon him.   It may be true, that under the recent decision of
the Supreme Court in the Fossat case, the United States District
Court possesses jurisdiction to control the location made upon
its decree, while the proceedings for confirmation are pending
before it; but, subject to this qualification, the action of the de-
partment in the case mentioned is a finality with the claimant.

We have considered at length the charge of fraud interposed
to the recovery, to show its groundless character; but the true
answer to objections of this and the like nature, if capable of
being established to their full extent, is, that they are inadmissi-
ble in an action of ejectment to impeach the patent.   In the case
of *Moore et al.* v. *Wilkinson,* decided in this Court at the April
Term, we had occasion to consider how far the conclusiveness of a
survey and patent could be questioned in an action of ejectment.
In that case, the defendants, claiming to be pre-emptioners of
the premises in controversy, under the laws of the United States,
offered parol evidence to show that the four leagues, as surveyed
and patented to the plaintiff, were different from the tract desig-
nated in the grant upon which the patent issued, and the map,.
to which the grant made reference, and that a correct location
of the tract, as granted, would not include the premises in suit.
The Court below excluded the evidence, and in sustaining its
ruling, we said : ¦" The government has provided a Board for the
determination of the validity of claims to lands held under Mexi-
can grants, and a system for the survey and location of the lands
upon the recognition and confirmation of such claims.   The sur-
vey and location are to follow the decree of confirmation.   The
approval of the survey by the proper officers is the determina-
tion—the judgment of the appropriate department of govern-
ment, that the survey does conform to such decree.   That
determination or judgment is not the subject of review by the
Judiciary.   It is conclusive upon the Courts, in actions of eject-
ment, as the adjudication of a competent tribunal, upon a sub-
ject within its exclusive jurisdiction.   The patent, which is the
final document issued by the government, is conclusive evidence.
of the validity of the original grant, and of its recognition and.
confirmation, and of the survey and its conformity with the con-
firmation, and of the relinquishment to the patentee of all the·

24

interest of the United States in the land.   It cannot be attacked collaterally, even for fraud, whether charged to have existed in ,the procurement of the original grant, or in the proof of its execution, or in the making of the survey.   For these matters the right of interference rests only with the government.   Individuals can resist the conclusiveness of the patent only by showing that it conflicts with prior rights vested in them. J And this brings us to the inquiry whether the defendants possess any such prior rights.   The 15th Section of the Act of Congress of 1851, provides that the final decree of confirmation and patent shall be conclusive between the United States and the claimants only, and shall not affect the interests of third persons.   If conclusive between the United States and the claimants, it must be equally so between persons holding under either of those parties; and, in *Waterman et al.* v. *Smith,* we held that the third persons mentioned in the Act, were those, whose titles were, at the time, such as to enable them to resist successfully any action of the government respecting it.   The patent took effect by relation, at the date of the presentation of the petition of the patentee to the Board of Land Commissioners, in March, 1852.   At that time the pre-emption laws of the United States, under which the defendants assert their acquisition of rights, were not extended to California.   Any rights which they possess were subsequently acquired, and must be subordinate to the result of the proceedings then pending by the grantees before the tribunals and officers of the United States.   Those proceedings had for their object the recognition of the grantees' claim, and the determination of its location with such precision as to leave no room for subsequent dispute and litigation.   If settlers, after steps taken for confirmation, could, by location, acquire such rights to the premises as to authorize them to compel a patentee, in every suit for the recovery of his land, to establish the correctness of the action of the officers of government in their survey and location, the patent, instead of being an instrument of quiet and security to the possessor, would become a source of perpetual and ruinous litigation, and the settlement of land titles in the country be delayed a quarter of a century.   The patentee would find it established in different suits, to the utter destruction of his rights, that his land should have been located in as many

different places within the exterior boundaries of the general tract, designated in his grant, as the varying prejudices, interests, or notions, of justice, of witnesses and jurymen might suggest."

The views here expressed are applicable to the case at bar, and are conclusive of the point that the defendant cannot—treating this as an action of ejectment—set up fraud in the survey or the procurement of the patent, to defeat the action of the plaintiff. We do not here express any opinion as to the rights of the defendant. These we shall hereafter consider. If it be assumed, for the present, that they are vested so as to avail the defendant against the assertion of any claim of the government respecting the premises in controversy, it would only follow that the patent was inoperative to that extent—not that it was void. The rights of the defendant would, in that case, be effectually protected by the provisions of the 15th Section of the Act of 1851, and the patent would be like a second deed to premises previously granted, and pass, as to the property, no interest.

Nor would the facts set up in the answer, as fraudulent, if presented in an original or cross bill, avail the defendant in avoiding or resisting the patent. The effect of the matters alleged by way of estoppel, we shall hereafter consider. We now speak of the charge of fraud—consisting, in the variance between the private and the official survey, and the alleged concealment of the latter. Misrepresentation to the government of the quality and character of the land is not averred in the answer, and if it were, the allegation would not change the case. The charge of misrepresentation and concealment, as we have seen, are without foundation in fact, and the change in the survey was the act of the government, and not of the patentee. These matters, then, would give the defendant no title to relief in a Court of Equity.

But there is another and a fatal objection to any equitable suit of the nature supposed. Fremont is not a party to this action, and he would be a necessary party to any proceeding to avoid or set aside his patent, on the ground that it was issued through fraud or misrepresentation. His rights cannot be determined or impaired in any side suit between third parties.

The proceeding by bill in equity, which an individual is allowed to take, to set aside a patent, or control its operation, is

in the nature of a bill to quiet title—to determine an estate held adversely to him—to remove what would otherwise be a cloud upon his own title; or is in the nature of a bill to enforce a transfer of the interest from the patentee, on the ground that the latter has, by mistake or fraud, acquired a title in his own name, which he should in equity hold for the benefit of the complainant. The individual complainant must therefore possess a title superior to that of his adversary, and, of course, to that of the government through whom his adversary claims, or he must possess equities which will control the title in his adversary's name.

Thus, in *Gaines et al.* v. *Nicholson et al.* (9 How. 364,) the plaintiffs, as Trustees of schools and school lands, of a township in Mississippi, claimed the 16th Section of the township, as appropriated for the use of schools, under certain acts of Congress. By provisions contained in a treaty with the Choctaw tribe of Indians, certain lands were reserved to several members of the tribe, and, among others, to one Wall—to be located in entire sections, and to include their residence and improvements at the time. Wall conveyed his interest in the section reserved to him to parties, who, representing that he resided upon the 16th Section of the township at the date of the treaty, and had his improvements thereon, obtained a patent from the President of the United States, and then brought ejectment against the tenant of the Trustees in possession of the premises. The Trustees, thereupon, filed a bill to stay the proceedings at law, and prayed for a temporary injunction in the first instance, and, afterwards, a perpetual injunction, alleging that the representation as to the residence and improvements of Wall—upon which the patent was issued—was false and fraudulent. The Court below decreed a perpetual injunction, and directed the patentees to relinquish their interest to the Trustees. The Appellate Court, after stating the facts of the case, and referring to the alleged false and fraudulent misrepresentation, says :

"This is the ground set forth by the complainants upon which to invoke the equitable interposition of the Court, to set aside and annul the patent, and remove the incumbrance from their title, and to stay the proceedings at law. And, undoubtedly, if the facts thus charged have been established by the proceedings

and proofs, a right to such equitable interposition for the relief sought has been made out, and the decree of the Court below should be upheld."

Here the Trustees asserted a title, which upon their allegation, was superior to that of the government at the time the patent issued, and though the suit is stated in the opinion of the Court to be to set aside and *annul* the patent, it was, in fact, as appears from the pleadings and judgment, only to stay proceedings at law and remove the cloud upon the title. In that particular case, the effect of the suit, had the decree been sustained, would have been the same upon the rights of the patentees, as if it had been brought to annul the patent absolutely. But, in many cases, the effect would be very different. A decree annulling a patent destroys it absolutely; a decree setting aside, or restricting its operation to the premises in controversy, still leaves it unimpaired in other respects. To annul a patent absolutely, proceedings can only be taken by the government, or some individual in its name, and that by *scire facias*, or by bill, or information. Individuals can maintain no proceedings to that effect, the question being one exclusively between the sovereignty issuing the patent, and the patentee. Thus in *Jackson* v. *Lawton*, (10 Johns. 24,) where two patents were issued for the same premises, Kent, C. J. said:

" The elder patent must, therefore, be impeached and set aside, before we can acknowledge any title set up under the younger patent; and the question is, whether it can be impeached by parol proof in this suit? Letters patent are matter of record, and the general rule is, that they can only be avoided in chancery, by a writ of *scire facias*, sued out on the part of the government, or by some individual prosecuting in its name. This is the settled English course, sanctioned by numerous precedents; and we have no statute or precedent establishing a different course." And, again :

" If the elder patent, in the present case, was issued by mistake, or upon false suggestions, it is voidable only; and unless letters patent are absolutely void on the face of them, or the issuing of them was without authority, or was prohibited by statute, they can only be avoided in a regular course of pleading, in which the fraud, irregularity, or mistake, is directly put in issue.

The principle has been frequently admitted, that the fraud must appear on the face of the patent, to render it void in a Court of law; and that when the fraud or other defect arises on circumstances *dehors* the grant, the grant is voidable only by suit. The regular tribunal for this purpose is *chancery*, founded on a proceeding by *scire facias*, or by bill, or information. It would be against precedent, and of dangerous consequences to titles, to permit letters patent (which are solemn grants of record) to be impeached collaterally by parol proof in this action."

In *Field v. Seabury et al.* (19 How. 332,) the point was presented, whether, when a grant or 'patent of land, or legislative confirmation of titles to land, has been made by the sovereignty or legislative authority only having the right to make it, there being no provision in the patent by law to inquire into its fairness as between the grantor and grantee, or between third parties, a third party could raise in ejectment, the question of fraud as between the grantor and grantee, and thus look beyond the patent or grant; and the Court, after stating that it was not aware that such a proceeding was permitted in any of the Courts of law, said further: "In England a bill in equity lies to set aside letters patent obtained from the King by fraud, (*Att'y-Gen'l v. Vernon*, 277, 370; the same case, 2 Ch. Rep. 353,) and it would, in the United States; but it is a question exclusively between the sovereignty making the grant and the grantee."

But it is unnecessary to pursue this point further, for even if the defendant possessed a title to the premises, no matters are shown, as we have already observed, which would authorize any equitable interference of the Court with the claim of the plaintiff on the ground that the survey was made and the patent procured by fraud.

We pass to the second ground of defense, that of estoppel. The only matters alleged in the answer by way of estoppel are the private survey of Fremont in 1849, and his presentation of the same to the Board of Land Commissioners, as embracing and identifying the tract he claimed; and subsequent public and repeated disclaimers by him at the time the defendant took possession of the premises in controversy in 1851, and, afterwards, up to July, 1855, of any title or claim to the property, and of

any title or claim to any land within the exterior bounds of the grant to Alvarado, except that designated in his survey.

Upon these declarations, the answer avers the defendant acted, and was induced to make valuable and permanent improvements upon the premises in controversy and adjacent property, at an expenditure of upwards of eight hundred thousand dollars; and insists that the plaintiff is thereby estopped from asserting any title under Fremont. Other matters are, also, urged by way of estoppel, not alleged in the answer, and which, but for the stipulation of the parties, would not be considered by the Court. In the affidavit for a continuance, to which we have already referred, it was stated that the defendant expected, by several witnesses named, to prove that from the time possession was taken of the premises, to that date, Fremont knew of the claim of the defendant to the property, and its occupation and improvement, and never set up any title to the same until July, 1855, or forbid the occupation and improvement. To prevent the continuance, it was admitted that the witnesses, if present, would testify as stated, and that their testimony should be deemed as actually given, or as offered and overruled as improper.

The Court passed upon these matters, and found that up to July, 1855, Fremont claimed the premises in his survey, and made the representations and disclaimers alleged, to the property in controversy, but that it was not shown that he *willfully made them, or intended to deceive or defraud the defendant, or to influence its conduct,* but that they were made "*without any fraudulent intent and before the final location of his claim, and when it was unknown where the lines thereof would be fixed,*" and that he knew of the occupation and improvements of the defendant from the time possession was taken, without forbidding the same, or claiming the premises, until July, 1855.

It is undoubtedly true that a party will, in many instances, be concluded by his declarations or conduct, which have influenced the conduct of another to his injury. The party is said, in such cases, to be estopped from denying the truth of his admissions. But to the application of this principle with respect to the title of property, it must appear, *first,* that the party making the admission by his declarations or conduct, was ap-

Biddle Boggs *v.* Merced Mining Co.

prised of the true state of his own title; *second*, that he made the admission with the express intention to deceive, or with such careless and culpable negligence as to amount to constructive fraud; *third*, that the other party was not only destitute of all knowledge of the true state of the title, but of the means of acquiring such knowledge, and, *fourth*, that he relied directly upon such admission, and will be injured by allowing its truth to be disproved.

These qualifications in the application of the doctrine will be found fully sustained by the authorities. There must be some degree of turpitude in the conduct of a party before a Court of Equity will estop him from the assertion of his title—the effect of the estoppel being to forfeit his property and transfer its enjoyment to another. "In all this class of cases," says Story, speaking of equitable estoppels, "the doctrine proceeds upon the ground of constructive fraud, or of gross negligence, which, in effect, implies fraud. And, therefore, where the circumstances of the case repel any such inference, although there may be some degree of negligence, yet Courts of Equity will not grant relief. It has, accordingly, been laid down by a very learned Judge, that the cases on this subject go to this result only, that there must be positive fraud, or concealment, or negligence, so gross as to amount to constructive fraud." (1 Story's Equity, Sec. 391.)

"In order to the introduction of this equity," says Adams, in his treatise on the doctrine of equity, "it is essential that there be intentional deceit in the defendant, or, at all events, that degree of gross negligence which amounts to evidence of an intent to deceive." (Side page, 151.)

In *Commonwealth* v. *Moltz*, (10 Barr, 531,) the Supreme Court of Pennsylvania, after citing several cases in which the doctrine of equitable estoppel was applied, said :

"In all these cases, there is some ingredient which would make it a fraud in the party to insist on his legal right." (Per Sergeant, J. in *Crest* v. *Jack*, 3 W. 238.) And, again : "To the constitution of this species of estoppel, at least three ingredients seem to be necessary : first, misrepresentation, or willful silence by one having knowledge of the fact; second, that the actor, having no means of information, was, by the conduct of the

other, induced to do what otherwise he would not have done, and, thirdly, that injury would ensue from a permission to allege the truth. *And these three things must appear affirmatively."*

In *Copeland* v. *Copeland*, (28 Maine, 539,) the Supreme Court of Maine, in considering the nature of these estoppels, after quoting the language of Lord Denman, in *Pickard* v. *Sears*, (6 Adolph. & Ellis, 469,) "that where one, by his words or conduct, willfully causes another to believe the existence of a certain state of things, and induces him to act on that belief, so as to alter his own previous position, the former is concluded from averring against the latter, a different state of things, as existing at the same time," said, "in this position, thus established, it must be observed, that several things are essential to be made out in order to the operation of the rule : the first is, that the act or declaration of the person must be willful, that is, with knowledge of the facts upon which any right he may have must depend, or with an intention to deceive the other party; he must, at least, it would seem, be aware that he is giving countenance to the alteration of the conduct of the other, whereby he will be injured, if the representation be untrue; and the other must appear to have changed his position by reason of such inducement."

In *Whitaker* v. *Williams*, (20 Conn. 104,) the Supreme Court of Connecticut, in considering the same subject, said: "The doctrine that one shall not be permitted to retract representations, in which is included conduct, by which he has induced another to adopt a particular course of action, supposes, and is to be understood with the qualification, which is, indeed, a part of the principle itself, that the one by whom such representations were made, had a knowledge of his rights. In laying down this qualification, we speak of the principle generally, and would not be understood to say that there may not be cases where there is such culpability on the part of the person making such representations, or such particular circumstances or consequences attending them, that he would not be permitted to set up the want of such knowledge."

In *Delaplaine* v. *Hitchcock*, (6 Hill, 16,) the Supreme Court of New York, per Bronson, J. said: "The mouth of a party will sometimes be closed after he has omitted to speak at the proper time, and has thus been the occasion of misleading a third per-

son. But there is no such thing as an estoppel *in pais* for neg-
lecting to speak or act, where the party did not know the facts
which, if known, would have made it his duty to speak or act.
An estoppel *in pais*, is a moral question. It can only exist where
the party is attempting to do that which casuists would decide
to be a wrong; something which is against good conscience and
honest dealing." (8 Wend. 483; 3 Hill, 215, 220.)

In *Brewer* v. *Boston & Worcester Railroad Corporation*, (5 Met.
479,) the demandant brought a writ of entry to recover a parcel
of flats appurtenant to his upland. The case was submitted to
the Court on a statement of facts, from which it appeared that
the demandant, and one Tolman, under whose wife the tenants
claimed, had agreed by parol upon a dividing line between the
flats appurtenant to their respective lands, and in the language
of the statement, "the demandant always claimed to own the
flats lying northeasterly of said line, and exercised various acts
of ownership on the same. He stated to the agent of tenants,
before they purchased the land and flats of said Tolman and
wife, that the land which he claimed lay northeasterly of said
line, and that he did not claim the land southwesterly of said
line, and he has also made similar representations to others.
After the tenants purchased of Tolman and wife, they pro-
ceeded, with the knowledge of the demandant, to fill up said
land lying southwesterly of said line, and to erect buildings and
fences thereon, and exercise other acts of ownership on the land;
and the demandant was frequently present and saw said improve-
ments, and pointed out the said line, and never expressed any
dissent to said proceedings, nor gave any notice to the tenants
that he had any claim to the said land."

Upon this statement of facts it was agreed by the parties that
if the Court should determine that the demandant was entitled
to the flats, he should recover in conformity to certain lines,
unless the Court should determine that the demandant was es-
topped as against the tenants from claiming the same. The
Court adjudged a recovery in favor of the demandant, stating
in its opinion that it decided the case on the ground that the de-
mandant had acted fairly, under a mistake, and that he had
made no declarations contrary to his honest belief at the time,
or with any intention to deceive the tenants. "And we think it

Biddle Boggs *v.* Merced Mining Co.

clear," said the Court, "that the declarations thus made do not operate in the nature of an estoppel. A party is not to be estopped to prove a legal title to his estate, by any misrepresentation of its locality, made by mistake, without fraud or intentional deception, although another party may be induced thereby to purchase an adjoining lot, the title to which may prove defective; for he may require a warranty; and it would be most unjust that a party should forfeit his estate by a mere mistake."

These authorities are sufficient to show the correctness of the qualifications we have placed upon the application of the principle of equitable estoppel. They might be multiplied to an almost indefinite extent. Tested by them, the matters set up can have no operation by way of estoppel. Fremont's claim, under the Alvarado grant, was to no specific tract. It was only an interest to a specified quantity, to be afterwards surveyed and laid off by the officers of government. Fremont evidently thought otherwise. He believed he could himself make the segregation. He, therefore, made the survey in 1849, which he annexed to his petition. He asserted his claim to that specific tract. The Board affirmed his claim to that tract, and it would appear a subsequent survey in 1852 was made under its decree, in conformity with it. Had the matter there rested, the present case would never have existed. But the decree of the Board was reversed by the District Court, and with the decree, the survey under it fell, as a matter of course. Fremont sought a reversal of that decree in the Supreme Court, and obtained its reversal, but that reversal was accompanied with a direction that the survey should be made in a particular form. The District Court entered in June, 1855, a final decree in pursuance of that direction. The only authoritative and official survey was made under that decree. That survey gave precision to Fremont's claim, and attached his title to the land it embraced. That survey covers the premises in controversy, and from its approval Fremont has asserted his right to them. From that approval his title to the land became perfect. The previous representations and disclaimers were clearly made under a misapprehension of his rights. It would be most unreasonable to hold that he intended to abandon all title to any land outside of his own private survey, or the survey under the decree of the Board—

provided the government should finally locate his claim on another and different portion within the exterior boundaries of his general tract.

The representations—under the circumstances, and the law governing the location of land claims under floating Mexican grants—could not be more than an expression of an opinion as to what ought to be its location, or the expression of a desire where it should be located. The defendant knew that the claim was a floating one—it is so averred to be in the answer—and evidently labored under the same mistake as to the right of the claimant to make the location as Fremont. The law was as well known to the company as to him; and both must be presumed to have known it, although, in fact, both were equally mistaken in its rule. To give the declarations and disclaimers made under these circumstances, the effect of an estoppel, operating, as it would, to deprive.Fremont of his estate in the premises, and transfer it to the defendant, would be, in the highest degree, inequitable and unjust. There is no proof of any intention to deceive, nor of any facts from which such an intention can be justly inferred. The Court passed upon the question, and found against the charge, and thus swept out the only basis upon which it could rest. The defendant has no title to the land; that vested absolutely in Fremont by the final decree and approved survey, evidenced, as they are, by the patent under the signature of the President of the United States. Whether, notwithstanding the title to the land is in Fremont, the defendant has a right to its use and occupation, as a mining corporation, for the purpose of extracting the precious metals, is another question, which we shall hereafter consider. To the land, the company has no title; it does not claim under the pre-emption laws of the United States, and if it did, the claim would be untenable, as mineral land is expressly exempted from pre-emption by the legislation of Congress.

But there is another and perfect answer to the application of the doctrine of estoppel in this case. The ground of complaint is, that Fremont represented that the premises were public land —not covered by his claim—and thus induced the defendant to enter upon the same and occupy and improve them as such. Suppose this were so—and that the land was public—no prohibi-

tion existed against a subsequent acquisition of the title from the superior proprietor.    The defendant could not acquire by mere occupation—we speak now of the land, not the mineral—any rights which could control the action of the government.    It could only hold so long as the superior proprietor permitted; and if that proprietor saw proper to give the land to Fremont, or to any other person, it could interpose no valid objection. The government could not be estopped from asserting its title and disposing of it, to whomsoever and whenever it thought proper.    The pre-emption laws not extending to mineral lands, the defendant was at best but a mere tenant at sufferance.

By the patent the government is estopped from asserting title to the premises, and if the position of counsel were tenable, Fremont is estopped from asserting title against the defendant.    It would follow that the defendant would have—by merely occupying the land as public land—rights superior to both, and that, too, in the face of an express prohibition of the sale by the government of the mineral lands.    It requires no argument to show the groundlessness of the position.

We pass to the consideration of the last ground of defense—the right of the defendant as a mining corporation to the possession and use of the land for the purpose of extracting the precious metals.    If it possess such a right against the true owner, it must be upon the ground that the mineral does not pass with the soil as an incident to it, but belongs either to the United States or to the State of California, and that the defendant has an effectual license to enter upon the premises and extract the same.

In *Hicks* v. *Bell*, (3 Cal. 219,) this Court held, that the mines of gold and silver belong to the State by virtue of her sovereignty. On the other hand, in this very case which we are now considering, Mr. Justice Burnett expressed the opinion that they belong to the United States by their succession to the rights of Mexico. And in the argument upon the rehearing, the position taken in both of these cases was attacked by many weighty considerations.    We do not purpose, however, to pass definitely upon the question; it is not essential to the determination of this appeal that we should.    The question is one of great magnitude and importance, and we purpose to postpone its consideration until

it can be presented to a full bench.   The situation of one of the Justices of this Court as former counsel of the Respondent, necessarily excludes him from a participation in its decision in this action.   We shall not, therefore, inquire whether or not the mineral passes with the soil.   We shall assume with reference to its ownership the position most favorable for the defendant, that it belongs to the General Government or to the State, for if the ownership is not in one or ʰhe other, the case of the defendant is closed, and the defense left wiʰhout any semblance of reason.*

Assuming, then, in the first place, for the purpose of this case, that the mineral belongs to the United States—has the defendant any effectual license to enter upon the premises of the plaintiff and remove it?

It is sometimes said, in speaking of the public lands, that there is a general license from the United States to work the mines which these lands contain.   But this language, though it has found its way into some judicial decisions, is inaccurate, as applied to the action, or, rather, want of action, of the government.   There is no license in the legal meaning of that term.   A license to work the mines implies a permission to extract and remove the mineral.   Such license from an individual owner can be created only by writing, and from the General Government only by Act of Congress.   It carries an interest in the land, and arises only from grant.   The mineral, whether a distinct possession or otherwise, constitutes part of the realty, as much so as growing timber, and no interest in it can pass, except in the ordinary modes for the disposition of land.   It is under the exclusive control of Congress, equally with any other interest which the government possesses in land.   But Congress has adopted no specific action on the subject, and has left that matter to be controlled by its previous general legislation respecting the public domain.   And it is from its want of specific action, from its passiveness, that the inference is drawn of a general license.   The most which can be said is, that the government has forborne to exercise its rights, but this forbearance confers no positive right upon the miner, which would avail as a protection against the assertion of its claims to the mineral.   The supposed license from the General Government, then, to work the

* See *Moore* v. *Smaw*, October Term, 1860.

mines in the public lands, consists in its simple forbearance. Any other license rests in mere assertion, and is untrue in fact and unwarranted in law.

It may be, and undoubtedly is, a very convenient rule, in determining controversies between parties on the public lands, where neither can have absolute rights, to presume a grant, from the government, of mines, water-privileges, and the like, to the first appropriator; but such a presumption can have no place for consideration against the superior proprietor.   Presumptions are indulged to supply the absence of facts, but never against ascertained and established facts.   That there has been no grant from the government is certain, for its records and legislation are public and open to examination, and its forbearance as to the public lands would not, as we have observed, avail against the assertion of its claims, much less confer rights capable of enforcement in reference to other lands.

But even if this forbearance were entitled to the slightest consideration as a *legal* objection to the assertion of the title of the government, which we do not admit, it could only be so in those cases where it has been accompanied with such knowledge, on its part, of the working of the mines and the removal of the mineral, as to have induced investigation and action, had this been intended or desired.   Such knowledge must be *affirmatively* shown by those who assert a license from forbearance.   This knowledge may be affirmed with reason as to mines on the public lands; but it is not shown—nor can it be—that the government ever knew that parties claimed, under its permission and authority, to enter upon private land held by title paramount to its own, and to extract and remove the mineral.   Nor do we admit that the United States—holding, as they do, with reference to the public property in the minerals, only the position of a private proprietor, with the exception of exemption from State taxation, having no municipal sovereignty or right of eminent domain within the limits of the State—could, in derogation of the rights of the local sovereign to govern the relations of the citizens of the State, and to prescribe the rules of property and its mode of disposition, and its tenure—enter upon, or authorize an entry upon, private property for the purpose of extracting such minerals ·imbedded in the soil, which could only be done by

lessening or destroying the value of the inheritance. The United States, like any other proprietor, can only exercise their rights to the mineral on private property, in subordination to such rules and regulations as the local sovereign may prescribe. Until such rules and regulations are established, the landed proprietor may successfully resist, in the Courts of the State, all attempts at invasion of his property, whether by the direct action of the United States, or by virtue of any pretended license under their authority. The defense resting upon such alleged license must consequently fail.

The claim of a license from the State with reference to the mines, assuming that she possesses title to the mineral, is based on her affirmative acts, and not on mere forbearance. By her legislation she has authorized the issuance of licenses to certain classes of persons; has provided for the introduction of proof of particular customs, usages, and regulations, in actions respecting mining claims; has levied taxes upon canals and ditches, constructed for the express purpose of conducting water to be used in mining for gold; and, in a great variety of instances, has expressed her recognition of a license in the miner to use whatever right she possessed. But this license very justly inferred, from the general course of her legislation, is restricted to the public lands. This has been expressly adjudged by this Court in repeated instances.

In *Stoakes* v. *Barrett*, (5 Cal. 36,) the Court said : " We held in the case of *Hicks et al.* v. *Bell et al.* that the mines of gold and silver in this State were the property of the State, and that the policy of her legislation permitted all persons to work for these metals. We did not, in that case, intend to go further than to decide the right of all citizens to dig for gold upon the *public lands ;* for although the State is the owner of the gold and silver found in the lands of private individuals as well as the public lands, *yet to authorize an invasion of private property, in order to enjoy a public franchise, would require more specific legislation than any yet resorted to.*"

In *Tartar* v. *The Spring Creek Co.* (5 Cal. 396,) the Court said : " The current of decisions of this Court go to establish that the policy of this State, as derived from her legislation, is to permit settlers in all capacities to occupy the public lands, and by such

occupation to acquire the right of undisturbed enjoyment against all the world but the true owner.

In evidence of this, acts have been passed to protect the possession of agricultural lands acquired by mere occupancy; to license miners; to provide for the recovery of mining claims; recognizing canals and ditches which were known to divert the water of streams from their natural channels for mining purposes, and others of like character.

This policy has been extended equally to all pursuits, and no partiality for one over another has been evinced, except in the single case where the rights of the agriculturist are made to yield to those of the miner, where gold is discovered in his land. *This exceptional privilege is, of course, confined to public lands,* as we held in *Stoakes* v. *Barrett et al.* at the last January Term;" and after referring to some previous decisions, the Court observed that: " It results from the consideration we have given the case, *that the right to mine for the precious metals can only be exercised upon public lands*—that although it carries with it the incidents to the right, such as the use of wood and water, *those incidents must also be of the public domain, in like manner as the lands*—that a prior appropriation of either to steady individual purpose establishes a *quasi* private proprietorship, which entitles the holder to be protected in its quiet enjoyment against all the world but the true owner, except in the single case provided to the contrary by the statute which I have already adverted to."

In *Fitzgerald* v. *Urton,* (5 Cal. 309,) the Court said : " The Legislature of our State, in the wise exercise of its discretion, has seen proper to foster and protect the mining interests as paramount to all others. In permitting miners, however, to go upon public lands occupied by others, it has legalized what would otherwise have been a trespass, and the act cannot be extended by implication to a class of cases not specially provided for."

But it is contended by the learned counsel of the defendant that these decisions, in limiting the license to the mines on the public lands, proceeded upon a misapprehension of the legislation of the State. We do not think so. The first statute respecting the mines was passed in 1850, and provides for the issuing of licenses to foreign miners. There is nothing in that act restricting in express terms the license to mine to the public lands, but

such must evidently have been the intention of the Legislature, as by the 14th Section, it is provided that it shall be the duty of the Governor, so soon as he shall be officially informed of the passage of a law by Congress assuming the control of the mines of the State, to issue his proclamation requiring all collectors of licenses to foreign miners to stop the issuance of licenses. The legislation anticipated, manifestly had reference to the public lands. (Ses. Laws of 1850, Ch. 97.) In the following year the law was repealed, and, in the same year, the Practice Act was passed, the 621st Section of which provides that, "in actions respecting mining claims, proof shall be admitted of the customs, usages, or regulations, established and in force at the bar or diggings, embracing such claim, and such customs, usages, or regulations, when not in conflict with the Constitution and laws of this State, shall govern the decision of the action." In 1852, the act in relation to possessory actions was passed. That act authorized suits by settlers on the public lands, for the purposes of cultivation or grazing, to maintain actions for interference with, or injuries done to, their possessions, with a proviso, that if the lands thus occupied include mines of the precious metals, the possession should not preclude entry upon the same as fully and unreservedly as it might have been made but for the possession.

There are other Acts of a similar character, but we do not see anything in them which directly asserts a right to mines on private lands. The first Act relating to mining licenses refers, as we have seen, to the public lands. The subsequent Acts relating to such licenses do not contain the provision of the first, but in their passage the Legislature only adopted a municipal regulation to govern the conduct of a certain class of persons, for the purpose of raising revenue from them, and did not undertake to dispose of any proprietary interest which she may have possessed in the mines. The Possessory Act applies only to public lands, and the provision as to the introduction of customs and usages in suits for mining, determines nothing beyond the admissibility of certain kinds of evidence.

The premises in controversy in the present case being private property, it follows that there is no pretense for the justification of the defense of a license from either the General or State Government. If the mineral belong to either government, there

must be, as held in *Stoakes* v. *Barrett*, more specific legislation than any yet resorted to, before the invasion of private property can be permitted in search of it or for its extraction. What that specific legislation should be in such case, it is unnecessary to determine. It is but reasonable to say that it should embody provisions for the protection of the rights of the landed proprietor, and furnish ample indemnity against the damage arising from the injury to his possessions.

The doctrine of an unlimited general license—put forth in many instances, and advocated by the defense—is pregnant with the most pernicious consequences. If upheld, it must lead to the spoliation of landed estates, under the pretense of mining, without possibility of protection or redress on the part of the owner. There is gold in limited quantities scattered through large and valuable districts, where the land is held in private proprietorship, and under this pretended license the whole might be invaded, and, for all useful purposes, destroyed, no matter how little remunerative the product of the mining. The entry might be made at all seasons, whether the land was under cultivation or not, and without reference to its condition, whether covered with orchards, vineyards, gardens, or otherwise. Under such a state of things, the proprietor would never be secure in his possessions, and without security there would be little development, for the incentive to improvement would be wanting. What value would there be to a title in one man, with a right of invasion in the whole world? And what property would the owner possess in mineral land—the same being in fact to him poor and valueless just in proportion to the actual richness and abundance of its products?

There is something shocking to all our ideas of the rights of property in the proposition that one man may invade the possessions of another, dig up his fields and gardens, cut down his timber and occupy his land, under the pretense that he has reason to believe there is gold under the surface, or if existing, that he wishes to extract and remove it.

We have thus gone over all the grounds taken by the defendant, and in none of them do we find any valid objection to the recovery of the plaintiff. In passing upon the case, we have extended the greatest indulgence to the defendant. We have con-

sidered matters not brought in issue by the pleadings, and which, because not presented by any written allegations, were not entitled to notice.    We have done so, partly, because argument was allowed upon them before the Court without objection, but, principally, because we have hoped to thus put at rest forever the controversy between these parties.    We do not intend, however, to allow this indulgence to be drawn into a precedent for permitting the loose practice thus adopted.    If parties consent that defenses, other than those alleged in their answers, may be set up, they must be presented by regular written allegations, in a properly traversable form, or we shall not regard them.

Judgment affirmed.

BALDWIN, J. having been counsel for the Respondent did not sit in the case.